WILLIAM F. HUSE ET AL. *v.* MARY CATHERINE REED ET AL.
[No. 12, April Term, 1929.]

*Decided June 25th, 1929.*

The cause was argued bfeore BOND, C. J., URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Arthur W. Machen, Jr.,* and *Wendell D. Allen,* with whom were *Armstrong, Machen & Allen* on the brief, for the appellants.

*Edward J. Colgan, Jr.,* with whom were *Paul R. Kach, Francis Key Murray,* and *Karr & Colgan,* on the brief, for the appellees.

SLOAN, J., delivered the opinion of the Court.

Benjamin Franklin Reed and Mary Catherine Reed, his wife, were the owners as tenants by the entireties of a parcel of land situated at the corner of Reese and Twenty-eighth Streets in Baltimore. In April, 1927, J. Henry Strohmeyer, a licensed real estate broker of Baltimore, was employed by Andrew J. Dietrich to purchase the lot mentioned from the Reeds, the negotiations between Strohmeyer and the Reeds covering about a year. At the first interview between Mr. Strohmeyer and Mr. Reed the latter stated his price to be $15,000, and, although Mr. Strohmeyer regarded the price as exorbitant, the old man (Mr. Reed being about eighty years of age), never wavered in his demands. Finally, on or about the first of April, 1928, Mr. Dietrich authorized Mr. Strohmeyer to pay $15,000 for the property and, on the second day of April, 1928, he called on the Reeds, tendered them his

check for $1,000 on account of the purchase money, and submitted a form of agreement for execution. Mr. Reed declined to sign the agreement, but said that the matter of the agreement would be referred to his attorney. The Reeds engaged Mr. Elmer M. Harper, an attorney at law and secretary of the Maryland Title Guarantee Company, with whom Mr. Strohmeyer thereafter dealt. A form of contract was prepared by Mr. Harper, which was satisfactory to Mr. Strohmeyer, and was sent by Mr. Harper to the Reeds on April 10th, 1928, to be executed by them. The Reeds signed the duplicate copies of the contract and returned them to Mr. Harper and, on or about April 12th, Mr. Strohmeyer called at his office, prepared to sign the contract and make the first payment of $1,000 on account. The signatures of the Reeds to the agreement had not been witnessed, and while all agreed that this was not necessary, it was agreed that it was desirable, and accordingly Mr. Harper again mailed the contract to the Reeds, with a letter requesting them to have their signatures witnessed and return the agreement to him, Mr. Strohmeyer at that time leaving with Mr. Harper the check which he had tendered the Reeds, and said that when the contract was returned to Mr. Harper he should turn it over to his clients and send him the agreement.

The appellant William F. Huse lived on property adjoining that of the Reeds, and, about the time the contracts were returned to them, Mrs. Reed told Mrs. Huse that they had sold their property, and immediately Mrs. Huse asked if any money had been paid on account, and, upon being informed that none had been paid (Mrs. Reed not having known of the delivery of the check for $1,000 to Mr. Harper), she advised Mrs. Reed that the contract was not binding, and the Huses proceeded to persuade the Reeds to repudiate their agreement with Mr. Strohmeyer, with the result that the same paper which had been signed by the Reeds, agreeing to convey the property to Mr. Strohmeyer, became an agreement to convey to Mary Agnes Martin, agent, a neighbor of Mr. Huse, who made the agreement on his behalf, Mr. Huse saying that he

made Mrs. Martin his agent because he did not want any one to know who was buying the property. The price named in the Huse, or Martin, agreement was $16,000, which was written into the original agreement instead of $15,000; the name of J. Henry Strohmeyer was crossed out, and Mrs. Martin's interlined. In addition to the property described in the Strohmeyer agreement, Mr. Huse added a small triangular piece of property on the opposite side of Twenty-eighth street, which was the consideration for his increasing Mr. Strohmeyer's price $1,000.

On May 31st, 1928, J. Henry Strohmeyer, agent, filed his bill in the Circuit Court of Baltimore against Benjamin Franklin Reed and Mary Catherine Reed, his wife, praying a decree against them for the specific performance of their agreement to convey the property mentioned in their contract with him. On the 20th day of July, 1928, Mary Agnes Martin, agent, and William F. Huse, filed a petition in the cause praying to be made parties defendant to the proceedings, and asking leave to file an answer to Mr. Strohmeyer's bill of complaint, and on the same day an order was passed accordingly, and thereupon an answer was filed by them setting up their contract, a copy of which they filed as an exhibit to their answer. On the 4th day of August, 1928, the plaintiff J. Henry Strohmeyer filed in that case an order to the clerk to enter his bill of complaint "dismissed."

The record shows that on the 3rd day of August, 1928, Mary C. Reed, widow and survivor of Benjamin Franklin Reed (who had died on July 3rd, 1928), by a duly executed deed conveyed to Andrew J. Dietrich the property which she and her husband had in April, 1928, agreed to convey to his agent, J. Henry Strohmeyer. The record also shows that on the same day an agreement was entered into between Andrew J. Dietrich and Mary Catherine Reed, stipulating that the purchase price of the property, $15,000, should be deposited in the Savings Bank of Baltimore in the name of Edward J. Colgan, Jr., and Paul R. Kach, attorneys. It was agreed that if no proceedings should be brought against Mrs. Reed

by William F. Huse and/or Mary Agnes Martin, agent, within six months, then the said sum of $15,000, with all accumulated interest, should be paid to Mrs. Reed by Messrs. Colgan and Kach, but that if within six months any such proceedings should be brought, then the fund should continue to be held on deposit until the final determination of the litigation and, "upon final termination of said litigation if it shall finally be adjudicated that the said Andrew J. Dietrich did not obtain title to the property at 2723 Reese Street described by the said deed to him of said Mary C. Reed, * * * then the said sum of $15,000 and interest shall be repaid to the said Andrew J. Dietrich who shall, however, first pay therefrom without any right to reimbursement, all the costs and expenses of said litigation, including the fees of the attorneys for the said Mary Catherine Reed. In that event the said Andrew J. Dietrich shall also reconvey the said property to the said Mary Catherine Reed." It was also provided that if, as a result of such litigation, it should be determined that Andrew J. Dietrich obtained a good and merchantable title by virtue of the said deed, then the said sum of $15,000 should be turned over to the said Mary Catherine Reed and that, in the event of any suit for damages being brought against Mrs. Reed by William F. Huse and/or Mary Agnes Martin as agent, Andrew J. Dietrich should be responsible for all fees, costs, expenses and any judgment which might be recovered against her.

On the 14th day of August, 1928, William F. Huse and Mary Agnes Martin, his agent, filed their bill of complaint in the Circuit Court of Baltimore City against Mary Catherine Reed, J. Henry Strohmeyer, agent, and Andrew J. Dietrich and Susanna Dietrich, his wife, wherein they set up their agreement with Benjamin Franklin Reed and Mary Catherine Reed, and prayed specific performance of the same, and also prayed that an order be passed annulling, vacating, and setting aside the deed of August 3rd, 1928, from Mary C. Reed to Andrew J. Dietrich. To this bill answers were filed by all of the defendants, testimony was taken

before the court, and at the conclusion of the case an order was passed by the Circuit Court of Baltimore City dismissing the bill, from which an appeal was taken by William F. Huse and Mary Agnes Martin, agent.

The appellants devote the greater part of their brief to the presentation of authorities to the effect that where the agreement contemplates a written contract, or, to be more exact, an agreement to be evidenced in writing (*Brantly on Contracts* [2nd Ed.], sec. 53-a), it cannot be considered a contract until reduced to writing and the writing signed. With this there can be no disagreement. But the record in this case shows that these requirements were met. The oral understanding of the parties, which was the agreement, was signed by the Reeds and mailed to their attorney, and so far as they were concerned everything contemplated by them as an agreement to convey had been done. In his letter addressed to Mrs. Reed, forwarding the agreement to his clients for execution by them, he said, "The contract of sale in its present form seems to be satisfactory for the protection of your interests and I would suggest, if after reading the same, it meets your approval that you and your husband execute both papers and return the same to me, whereupon I will deliver one of them to Mr. Strohmeyer upon receipt of a check for $1,000.00." The agreement was signed by the Reeds as requested by their attorney, and, although there was a blank on the writing for attestation, Mr. Harper's letter did not direct their attention to it. After the receipt by Mr. Harper of two copies of the agreement, both signed by the Reeds, Mr. Strohmeyer called at Mr. Harper's office and was shown the signed agreement, his testimony being: "He showed me the paper and I found there was no test to the signatures and I said to Mr. Harper, 'Now what do you think of that, it seems to me there ought to be a test to the signature,' and he said, 'Well, I think so, too,' and I think it will be all right, we will send it back and have it attested. At that time I handed him the check and told him to keep it because when the paper came back witnessed he could send it to me and conclude the negotiations." Mr. Harper testi-

fied that he told Mr. Strohmeyer he "had dictated the letter returning the copies of the agreement" to be witnessed. These facts in our opinion show a sufficient acceptance of a written agreement of the Reeds to convey to Strohmeyer, an agreement as to the terms of which the parties were in accord, and when he deposited his check with Mr. Harper, the vendor's attorney, it was the deposit required by the agreement, and the payment to the attorney was as effectual as if made to the Reeds. The paper was mailed by the Reeds to Mr. Harper with the authority to him to receive Mr. Strohmeyer's check. As his letter to them stated that, upon the return of the papers, he would "deliver one of them to Mr. Strohmeyer upon receipt of a check for $1,000." When the paper was sent back with the request for attestation, with which they could comply or which they might refuse (a refusal which would not have affected the validity of the contract), they, by their attorney, had already accepted the down payment on account required by the Reeds.

In *Sarasohn v. Kamaiky,* 193 N. Y. 203, it is said: "Whether certain acts, words and circumstances constitute a delivery of an agreement is a question of intent. * * * Any evidence that shows that the parties to a written instrument intend that they should be operative and binding upon them is sufficient in an action to enforce its provisions." And in *Renehan v. McAvoy,* 116 Md. 356, 359, it is said that what constitutes a sufficient delivery "depends largely upon the facts and circumstances of each particular case." See *Houlton v. Houlton,* 119 Md. 180; *Clark v. Creswell,* 112 Md. 339.

When the Reeds mailed their signed agreement to the attorney, Mr. Harper, there was no other idea in their minds than that they had sold to Mr. Strohmeyer, and, when he gave Mr. Harper his check, it was a compliance on his part with a requirement of the signed agreement, every provision of which was acceptable to him, and was the evidence of his acceptance of it, and we hold that these facts constitute a delivery of an enforceable contract.

The appellant contends that the written agreement contemplated the signature thereto of Mr. Strohmeyer, and that,

until his signature was affixed to it, it could not be accepted by him and that until this was done there was no contract. In *Brewer v. Sowers,* 118 Md. 681, 689, it was said: "There may be a mutual contract to which both parties have given their assent, though the evidence of such assent may exist in a different form as to the two parties," and there are many instances in this state wherein contracts signed only by the vendor and not by the vendee have been enforced as not lacking in mutuality. *Engler v. Garrett,* 100 Md. 387; *Thomas v. G. B. S. Brewing Co.,* 102 Md. 417, 424; *Jaeger v. Shea,* 130 Md. 1, 5; *Hensel v. Calder,* 135 Md. 487.

When the Huses entered the transaction, they knew their neighbors, the Reeds, had agreed to sell their property (Mrs. Reed said sold), to J. Henry Strohmeyer, agent. Mr. Huse said he suspected the real purchaser to be Mr. Dietrich. He said Mr. Reed had always promised to sell the property to him, yet it seems strange that there had been no mention or thought of this in the year Strohmeyer had been negotiating with him. Although the appellants attempted to impress the court with the desire of the Reeds to sell their property to them, and that Mrs. Reed proposed the sale to Mrs. Huse, it is a fact that Mrs. Huse was at the Reeds' when Mrs. Reed had the unopened envelope of Mr. Harper in her hand, saying that there was a thousand dollars in it, which she evidently expected, and that it was then that Mrs. Reed said they had sold their property, and, in opening the envelope and finding both copies of the agreement with the request of their attorney for attestation of their signatures, Mrs. Huse promptly asked whether any money had been paid and, upon Mrs. Reed saying "no," she began to operate on the Reeds to persuade them to violate their agreement with Mr. Strohmeyer, and used the failure of a cash payment as the inducement to repudiate the contract and sell to them. At that time Mrs. Reed did not know that Mr. Harper, who was still her attorney and through whom the transaction was being consummated, had accepted Mr. Strohmeyer's check for one thousand dollars.

Ordinarily such a proceeding as this, in which a third party is involved, arises where a subsequent purchaser takes

512

a conveyance, with or without notice of an outstanding contract. *Pomeroy's Specific Performance* (3rd Ed.), secs. 464-466; *Smoot v. Rea,* 19 Md. 375; *Engler v. Garrett,* 100 Md. 387; the opinion in the last case citing *Worthington v. Lee,* 61 Md. 20, saying: "Whenever the specific execution of a contract respecting land would have been decreed as between the original parties, it will be decreed against all persons claiming under them unless other controlling equities have intervened." With whom are the equities in this case?

There is nothing in the record from which it can be inferred that the Reeds did not intend to carry out their agreement with Strohmeyer, and there probably would have been no obstacle put in the way of a sale to him if Mrs. Huse had not been at the Reeds' when Mr. Harper returned the agreements. But she was present, and quickly took advantage of the situation to ask whether any money had been paid, and it is evident that this was a controlling factor, inducing the Reeds to yield to the importunities of the Huses. *Beach's Equity,* sec. 572.

This case in many respects resembles the case of *Gunther Brewing Co. v. Brywczynski,* 107 Md. 696. The Gunther Company had a mortgage on the property of one Marks with an option to purchase. Marks afterwards gave the appellee an option with $150 paid on account of the purchase money. Pursuant to its option the Gunther Company took a deed from Marks. The only difference between that case and this is that the Gunther Company had a mortgage on the property with an option to purchase. The general principles applied, as stated in the opinion in that case (page 701), were: "The mere fact of the existence of a valid contract is not sufficient to entitle the plaintiff to this relief, but the court has regard for the conduct of the parties and circumstances outside the contract. * * * The contract must be free from any suspicion of its bona fides. * * It must be made under circumstances that favorably commend it to the court. * * * A party insisting upon specific performance must make out a complete equity."

There can be no dispute about the fact that Benjamin Franklin Reed and Mary Catherine Reed, his wife, agreed to convey to J. Henry Strohmeyer, agent, the lot of ground mentioned in the agreement drawn by Mr. Harper; that there was no disagreement about the property to be conveyed and the price to be paid, and the impression we gather from the record is that the consideration was fair and adequate. If, after the death of Benjamin Franklin Reed, his widow chose to keep her agreement with Mr. Strohmeyer or his principal, Mr. Dietrich, there is no reason why this court should not respect her decision.

This case is exactly the same as that of *Maguire v. Heraly,* 163 Pa. 381, 43 Am. St. Rep. 800 (except that in that case there was no writing between the grantor and grantee), wherein the court said that while the vendor "was not legally bound by her contract, * * * on the other hand she was under no obligation, legal or moral, to repudiate it. If she chose to recognize and execute it she had a right to do so and a court of equity will not deny her this right." See *Patterson v. Martz,* 8 Watts (Pa.), 374, 34 Am. Dec. 474; *Gallaher & McCabe v. Hunter,* 5 Mo. 507. If Mrs. Reed chose to run the risk of any obligations or of incurring any liability which the agreement with Huse imposed upon her, that was a matter which concerned her, and which she could decide for herself. Nor do we find that Mr. Dietrich was guilty of any wrong in protecting her against loss. He was the one wronged, and the appellants have not shown any equitable reason why Dietrich could not take title to the property which he, through his agent, Strohmeyer, had agreed to buy. In our opinion Mrs. Reed, when she conveyed to Dietrich, and he, when he accepted her deed under the circumstances shown in this case, were acting entirely within their rights, and, in the absence of any proof of fraud or bad faith on the part of any of the appellees, the decree of the chancellor should be affirmed.

*Decree affirmed, with costs to the appellees.*