L. C. DEAN et ux., Appellees, v. LEE A. SARGENT et ux., Appellants.

No. 46376.

DECEMBER 14, 1943.

Genung & Genung, of Glenwood, for appellants.

Cook & Cook, of Glenwood, for appellees.

BLISS, J.—The petition alleged the execution of the contract by the plaintiffs and the defendants, the payment of the earnest money by the plaintiffs on the signing and delivery of the contract, the repudiation of the contract thereafter by defendants, and the subsequent offer and tender of performance in full by the plaintiffs. A copy of the contract attached to the petition as an exhibit, the original of which was received in evidence, bears date of November 5, 1942, but was not executed by the parties until November 23, 1942. It provides that the defendants as first parties have that day sold to plaintiffs as second parties eighty acres of land in Mills county, for which they agree to pay $8,250, payable $500 in cash to first parties, as a down payment, "receipt whereof is hereby acknowledged," $3,750 in cash on March 1, 1943, and the balance of $4,000 by delivery of a deed to a residence property in Glenwood.

The answer of the defendants denies generally, but admits the signing of said agreement, and specifically denies that the contract was ever delivered to plaintiffs or that defendants ever received any check or money thereon. The answer also alleges that the contract was signed by defendants in a three-way deal in which plaintiffs' property was to be taken over by defendants upon condition only that defendants made a further trade with Gerald Richardson for farm lands, on which he was to take the Dean house at $4,000. The answer alleges that the Richardson deal was not made and the contract with Dean was not delivered to him (Dean), but the contract and the $500 check issued by Dean has at all times been in the possession of Haney, a real-estate broker, who has at all times retained possession of the contract under orders from defendants not to deliver it to plaintiffs. Trial was had upon the issues made by the pleadings. The only defense issues were those alleged in the answer.

The court entered a decree finding that the equities of the cause were with the plaintiffs; that the minds of the parties met, that there was a delivery of the contract, that completion of the Richardson transaction was not made a condition in the transaction expressed in the written contract between the plaintiffs and defendants; that plaintiffs had made sufficient proof of performance and offer to perform, and were entitled to specific performance of the contract, as prayed for.

After full review of the record it is our judgment that the findings of fact, conclusions of law, and the decree of the trial court are fully sustained. The facts of the case are controlling in its determination, and, while they are somewhat complicated, the right of the matter is quite apparent. Wallace Haney, a real-estate broker in Glenwood, is a pivotal figure in the case. For clarity we will speak of the plaintiffs as Dean, meaning Mr. Dean, and of the defendants as Sargent, meaning Mr. Sargent. Haney had rented the house involved herein for Dean. As a witness for Sargent, Haney testified:

"I can't tell you exactly the date when Mr. Dean first mentioned to me the trading of his house, but I would say it was possibly a year before. I had the house on my list for

$5000.00, but I did not show it to anybody at that price. It really was not listed. After Murphy vacated the house * * * I asked Leonard Dean what he was going to do with the house and he said he might sell it and I asked the price and he said $5000.00.''

Dean testified that Haney ''had been working on the place,'' and that he came around and said Sargent was trying to sell his place. Haney tried to sell him the Sargent eighty, and Dean said he would buy it if his house was taken in on the deal and Haney began negotiating the deal between him (Dean) and Sargent.

Haney testified that when he ''first talked to Mr. Sargent about trading this land, the deal did not go through right away as there was more or less talk with Mr. Dean and between myself and Sargent. The contract was not accepted when we first talked about it but was accepted later. * * * I dickered around with Mr. Sargent and Mr. Dean quite a while before I got them to make the price.'' Haney prepared the contract involved herein, apparently on November 5, 1942, as that is the date appearing in the contract. The record does not expressly show whether he drew the contract on his own motion or at the request of someone. It is quite clear that he did not prepare it at the request of Dean, but probably at Sargent's suggestion, as the terms were the final offer of Sargent. Haney took the contract to Sargent first after it was prepared. The following record then appears:

''Q. Now, did he [Sargent] say anything to you at that time about getting Dean's signature on it? A. Well, there seemed to be a little kick about a tin roof and he said he would rather I would iron that out with Dean before he signed any contract. He said he wanted that to cover a corncrib and I went up and asked Dean about it and he said that would be all right. * * * I reported back to Sargent and he said well, he had to have the tin and he didn't want to take it off without his knowledge, that he wanted it to be OK before he signed it. * * * Q. What did he [Sargent] say about delivery of the contract, or having Dean sign the contract? A. He didn't say anything in particular. I told him I would have Leonard

[Mr. Dean] sign it before I had Mrs. Dean sign it. * * * Q. Then you took exhibit one, the contract, after Sargent signed it and after all of these negotiations had been had before that and went up to Dean and says, 'this is the way Sargent will trade and he won't trade any other way'? A. That is true. Q. And didn't you say [to Dean] 'if you want to trade you better put your name on that contract'? A. That is just about word for word what I told him. Q. In response to that he signed and gave you the $500? A. That is right.''

After signing the duplicate contracts under the signature of Sargent, Dean made out his check for $500, payable to Lee Sargent, dated November 23, 1942, bearing this notation, ''Payment on exchange of properties,'' and gave the check to Haney, together with the contracts, and told Haney to go to the library and have Mrs. Dean sign them and then to have Mrs. Sargent sign them. Testifying as to this, Dean said:

''I wanted everybody on the contract so there was no chance of any trouble, if we made the trade, and I left the contract with him [Haney] and he did that.''

For some time Haney had been employed by Richardson to dispose of 123 acres of bottom land along the Missouri River. Haney began negotiating with Sargent to buy the Richardson land. Haney told Richardson that he could get him $5,750 for the land, provided he would take the Dean house at $4,000. Richardson said he would make the deal provided Haney would then dispose of the house. Richardson, as a witness for Dean, testified:

''I had Haney employed to try to make a deal on that land. * * * Haney came down and said he would give $5750.00. That is the last offer I made. I said I would take the Murphy house belonging to Leonard Dean. That I had no use for it but Wallace [Haney] told me that he had a buyer and he would get $5750.00 and I said I would take the house in the consideration if he would go ahead and turn it. I was ready any time he got the money for the payment; ready to go through with the deal at any time. I never told Sargent that I was, but I did tell Haney that.''

In answer to the question of whether he was willing, ready, and able to complete his contract with Sargent on November 23, 1942, Richardson replied, "Yes, I was." Richardson testified that Haney told him he had a purchaser for the Dean house at $4,000. A week after that date, according to the testimony of Richardson and Haney, Richardson was still willing to complete his deal with Sargent. Haney testified:

"At that time [November 23, 1942] I think I was able to furnish a purchaser for the Dean house for Richardson for $4000.00."

After Haney had procured the signatures of Dean and his wife to the Sargent contract, in duplicate, he took them and the $500 check to Sargent and together they went to the Sargent home to have Mrs. Sargent sign them. After she signed them she handed them back to Haney. She did all of this in the presence of her husband. At that very time Haney had in his pocket the contract of the Sargent-Richardson deal signed by both Sargent and his wife. Richardson was ready to sign and had told Haney so. Haney testified that after Mrs. Sargent had signed the contracts he asked Sargent about endorsing the $500 check, and he pinned the check on the Richardson contract. Of this Sargent testified:

"Q. Now, was there something then said about the contract and check and Haney asked you to endorse the check so he could use it in a deal between you and Mr. Richardson? A. I said, I think, 'we better look at that land,' I said, 'If I was sure there was that much land down there—before we complete the deal [with Richardson] we had better go down and check on the land.' "

They looked at the land again and Sargent decided not to close the deal with Richardson. Haney, on being asked what Sargent asked him to do with the Sargent contract, replied:

"Well, he asked me if I would just as soon tear it up and he would pay me my commission on the sale."

Haney refused to do this, and when he told Dean of Sargent's actions Dean told him not to tear up the contract as

he was going to hold Sargent to the contract. Haney retained both copies of the contract and the check. Sometime before March 1, 1943, he delivered one of the signed contracts to Sargent. Dean talked with Sargent before March 1, 1943, and asked Sargent to perform the contract, and Sargent refused but told Dean he saw no way in which he (Sargent) could back out.

I. As the suit was tried, and is submitted on appeal, there are but two issues in the case: First, was there a delivery of the contract, and second, was the delivery unconditional? It is our conclusion that there was an unconditional delivery of a completed contract. We discuss first the question of delivery. It appears without question in the record, and it is asserted by appellants in argument, that Haney was the agent of Sargent in negotiating the sale with Dean. Haney prepared the contract, apparently after getting Sargent's final proposition. He then submitted it to Sargent as the latter sat in his car at one corner of the square, and Sargent signed the contract. His wife was not in town. Haney then took the contract to get it executed by Dean and wife. Dean accepted the signed offer of Sargent as embodied in the prepared contract and assented to it by signing the contract, and partly performed it by signing and giving to the agent of Sargent a check for $500 payable to the latter. This check was good and it is not questioned as a payment. Dean then directed Haney where to find Mrs. Dean and asked him to have her sign the contract. This she did, and Haney then took the contracts and the check to Sargent, who took Haney to the Sargent home to get the signature of Mrs. Sargent. She signed the contracts in the presence of her husband, no doubt at his direction, and handed them to Haney. Certainly the offer of the Sargents had been accepted by the Deans, and the contract fully evidenced and executed in writing by all parties, and the acceptance of the Deans communicated to the Sargents by delivering the contracts to each of them. Delivery of the signed contracts to Haney, the agent authorized and directed by Sargent to have the Deans execute the contracts and return them, was a legal delivery, but there was then a further personal delivery to the Sargents. To say that there was no delivery of the contracts to the Sargents because they were immediately handed back to

Haney is the merest quibbling. There was not only a delivery but it was a manual delivery to them.

As stated above, delivery to the agent employed by Sargent to negotiate the deal and to close the transaction by procuring the fully executed contracts was a sufficient delivery in fact and in law. The Deans thereby put the contracts out of their possession and control and put them into the possession and control of the Sargents.

 It is a sound principle of law that a contract for the purchase of real estate, signed by the purchaser and delivered to the vendor's agent, is a delivery in effect and in law to the vendor, although the question has been passed upon surprisingly few times. We find no authority contrary to appellees' contention. In Monroe v. Bailey, 145 Ky. 794, 141 S. W. 412, Bailey sold Monroe land by contract signed by each of them. After the earnest-money payment, cash was to be paid on delivery of the deed within a few weeks, and the balance by yearly payments and the assumption of a mortgage. Monroe refused to perform and decree for specific performance was rendered for Bailey. One defense was that when Monroe signed the contract and gave a check for the down payment he delivered them to the vendor's agent in the transaction. He contended this was not a delivery. The court held to the contrary and was affirmed on appeal.

In Carr v. Howell, 154 Cal. 372, 381, 97 P. 885, 889, specific performance was decreed plaintiff as purchaser of real estate from defendant's intestate. The vendor lived in New Orleans and owned property in Los Angeles for which one Clark was the agent. He and plaintiff's agent agreed upon a sale, and a contract in duplicate and a cash payment were sent to the vendor with instructions to sign contracts and return one to her agent, Clark. She did this but Clark never delivered the copy to plaintiff. In the suit this fact was set up as a defense of no delivery. In affirming the decree, the Supreme Court of California said:

"In pursuance of this request Mrs. Dwyer [vendor] signed the two agreements, kept one, retained the money * * * and returned the other agreement to Clark. The natural inference

would be that she returned it to Mr. Clark for Mr. Carr as the latter requested. Nothing in her conduct, until after the final tender by Mr. Carr, evinced any belief or contention on her part that the contract was not executed. On the contrary, it is all consistent with the theory that she considered the matter of the contract a completed transaction and was desirous only of a full performance of its terms. Although Clark was Mrs. Dwyer's own agent, she could, nevertheless, make him the custodian of the contract for the benefit of Carr, and if she did so and delivered the contract to Clark for Carr, as the evidence tended to show and as the court manifestly believed she did, it was a sufficient delivery to complete its execution as a subsisting contract. * * * The evidence sustains the finding that the contract was delivered.''

In the case before us it was, of course, the intention of Sargent, when he had the contracts drawn in duplicate, that Dean should have one on their execution. And when Dean signed the two copies and gave them, with his check, to Haney, who had been the intermediary throughout the negotiations, he, of course, expected one copy signed by the Sargents to be returned to him by Haney. And that, no doubt, was Sargent's thought when he gave the contracts to Haney after Mrs. Sargent signed them. That was before he changed his mind on the Richardson deal. It has been argued by appellants that a delivery of this duplicate to Dean was necessary and that any delivery to Haney for Dean was insufficient. Such a delivery was not necessary, but if it were, it was sufficient.

In Huse v. Reed, 157 Md. 504, 510, 146 A. 579, 581, a specific-performance suit, the purchaser, through his broker, sought to buy defendant's property and tendered contracts of purchase in duplicate with check for the down payment. The vendor sent the contracts to his attorney for approval. The latter told the defendant and wife (vendors) to sign them, which they did. The broker thought the contracts should have been attested by witnesses, and they were returned to the vendors for that purpose. The broker left the check with vendors' attorney and told him to send it to the vendors when the contracts were returned and to send the contracts to him. This was done, but

later the vendors refused to perform, claiming that there had been no delivery to the purchaser or to his broker. In holding that the delivery by the vendors to their attorney was a delivery to the broker, even though the latter never signed the contract, the court said:

"When the Reeds [vendors] mailed their signed agreement to the attorney, Mr. Harper, there was no other idea in their minds than that they had sold to Mr. Strohmeyer [broker], and, when he gave Mr. Harper his check, it was a compliance on his part with a requirement of the signed agreement, every provision of which was acceptable to him, and was the evidence of his acceptance of it, and we hold that these facts constitute a delivery of an enforceable contract."

And when Dean signed and returned the contract and check to Sargent he had no other thought or intention than fully accepting and assenting to Sargent's offer. The agreement was thereby fully consummated.

We have no doubt that delivery of a contract, or other instrument, or article, requiring delivery, to an authorized agent, is delivery to his principal, whether that principal be a seller or purchaser; and that delivery does not necessarily mean manual tradition. See, also, Avis v. Rebhan, 92 Cal. App. 178, 267 P. 898; Botsford v. Heney, 12 Cal. App. 380, 107 P. 593; In re Application to Register Title to Real Estate, 208 Minn. 453, 294 N. W. 457, 458; 12 Am. Jur., Contracts, section 63. Delivery is ordinarily essential to the operation and validity of a deed or a contract, but neither manual transfer of the instrument nor any particular form of ceremony is necessary to constitute good delivery, which may be by acts without words, or by words without acts, or by both words and acts, it being necessary merely that the grantor or promisor intends that the instrument shall become operative and take effect as a valid obligation. Deitz v. Deitz, 295 Ill. 552, 129 N. E. 508; Fitzpatrick v. Brigman, 130 Ala. 450, 30 So. 500, 501; Crawford v. Bertholf, 1 N. J. Eq., Saxt., 458, 467; Jones v. Jones, 6 Conn. 111, 16 Am. Dec. 35; Carnahan v. Gupton, 109 Mont. 244, 96 P. 2d 513; Cumnock-Reed Co. v. Lewis, 278 Ky. 496, 128 S. W. 2d 926.

█ There is also authority, and we believe it to be sound, that, if there is legal delivery of the original contract, the failure to deliver the duplicate contract to the other party does not render the contract unenforceable. In Templeman v. Closs, Tex. Civ. App., 212 S. W. 187, 189, the court held:

"The general rule as to delivery of written instruments does not require that a copy or duplicate of a mutual agreement be delivered to each of the parties in order to render the agreement effective. Weaver v. Simmons, 15 Tex. Civ. App. 154, 38 S. W. 1140."

Petition for rehearing was denied by the supreme court in the cited case. For a like holding, see George v. Smilansky, 238 Mich. 700, 214 N. W. 61.

It is our conclusion that there was a delivery of the contract from Dean to Sargent, which was all that was necessary to make the contract enforceable. It is also our conclusion that there was a delivery of one of the duplicate contracts by Sargent to Haney for Dean, although such delivery was not essential to render the contract between them enforceable. Certainly, after the delivery of the check and contracts to Sargent, there was both mutuality of obligation and remedy between Sargent and Dean, and Sargent could have enforced the contract against Dean. Likewise, Dean could enforce the contract against Sargent. When Mrs. Sargent signed the contracts the transaction with the Deans for the sale of the Sargent eighty acres was completed.

"The delivery is complete when the contract, being ready for delivery, is handed to the promisee with the intention at the time of passing the present title. * * * After the delivery is complete, an attempt by the parties to regain possession of the instrument is immaterial." 17 C. J. S., Contracts, section 64.

The $500 check was then the property of Sargent. Haney recognized this and he attached it to the Sargent-Richardson contract, which Sargent and wife had signed, and Richardson was ready to sign, and Haney suggested that Sargent endorse it so that the Richardson deal could be closed. But Sargent said he would not endorse it yet, and stated:

"\* \* \* before we complete the deal [with Richardson] we better go down and check on the land."

This brings us to the other question for determination.

II. Is there merit to appellants' contention that the Dean contract was conditioned upon the Richardson deal going through? The record, it appears to us, gives a negative answer. It is a matter of significance that this condition is not given expression in the Dean contract. Haney testified, for appellants, that in all of his negotiations and talks with Dean he never mentioned such a condition. Sargent never claimed, as a witness, that there was ever any such condition. Haney testified that Sargent never made any such claim to Dean. When Dean signed the contract and gave his check for $500 he made no inquiry about the Richardson deal, because he had no knowledge that it was tied with his contract. It is true that Haney had told him that Sargent was going to deal the house to Richardson, but Dean was not interested in what Sargent did with the house, so long as it had not been made a condition of his contract. If he gave it any thought when he signed the contract, he may have concluded that the matter had been fully settled or arranged. Sargent never testified that the Dean contract was to become effective only if the Richardson deal went through. Although Haney testified that Sargent desired the Richardson deal before making the deal with Dean, there is no testimony by anyone that the Dean contract was contingent or conditioned upon the Richardson deal, or that any such condition was made known to Dean. It is true that Sargent had to obtain the Dean house before he could close with Richardson, but that did not make the Dean deal contingent upon the Richardson transaction. This was no three-way contract. There were two separate transactions so far as Dean was informed or knew. This clearly appears from Haney's testimony: "I was trying to make a deal *between Dean and Sargent* and *Sargent and Richardson*." (Italics supplied.)

Dean and Richardson never had anything to do with each other, either directly or through another. Sargent had closed one contract and had gone so far as to sign the Richardson contract, and Haney and Richardson thought the contract was as

good as closed, when Mr. Sargent reneged on that deal. And having done that, according to Haney, "he *asked* me to tear up the [Dean] contract and said he would pay my commission." If there had been no delivery of the Dean contract, or but a conditional delivery, he would have *demanded* as a matter of right that the contract be torn up and not have *asked* for it as a favor. His conduct strongly tends to show that he knew that Haney was entitled to his commission on the Dean contract as a matter of right, because he fully realized that the Dean contract was fully consummated and unconditionally delivered and was enforceable. We find no merit in this defense.

The decree is therefore—Affirmed.

MULRONEY, C. J., and OLIVER, HALE, MILLER, GARFIELD, WENNERSTRUM, and SMITH, JJ., concur.

MANTZ, J., takes no part.