# SAMUEL E. ROBINSON

*vs.*

# ANNIE S. JOHNSON AND JOHN B. JOHNSON, HER HUSBAND.

*Sale of Land—Stipulation as to Time—Meeting of Minds.*

The general rule that a stipulation as to time of payment of the purchase price does not require strict performance is subject to the qualification that a purpose to make time of the essence of the contract may be disclosed by its terms, or by the circumstances and object of its execution and the conduct of the parties. p. 618

Where a real estate agent, who had no authority for the purpose, signed, in the name of the owner of certain property, a contract for the sale thereof, also signed by the intending purchaser, which named a certain time for payment of the purchase price, and the owner, on receiving the contract, signed and returned it to him, but with an interlineation naming a different time for payment, *held* that there was no enforcible contract, but merely an offer and counter proposal. p. 619

*Decided January 13th, 1921.*

Appeal from the Circuit Court for Washington County, In Equity (WAGAMAN, J.).

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS and OFFUTT, JJ.

*Thomas Charles Williams,* for the appellant.

*Charles D. Wagaman,* for the appellee.

THOMAS, J., delivered the opinion of the court.

The bill of complaint in this case was filed in the Circuit Court for Washington County for specific performance of an alleged contract of sale of the leasehold interest in a lot of land in Baltimore City, Maryland, known as No. 2212 Druid Hill Avenue.

The contract sought to be enforced and filed with the bill is as follows:

"This Agreement, Made this 29th day of May, in the year nineteen hundred and nineteen, between A. S. Johnson, of the first part, and Samuel E. Robinson, of the second part:

"Witnesseth, That the said party of the first part does hereby bargain and sell unto the said party of the second part and the latter does hereby purchase from the former the following described property, situate and being in the City of Baltimore, State of Maryland, and known as No. 2212 Druid Hill Avenue, subject to a ground rent of one hundred dollars, at and for the price of twenty-two hundred dollars, of which fifty dollars has been paid prior to the signing hereof and the balance is to be paid as follows: Twenty-one hundred and fifty dollars in cash on or within sixty days from date. And upon payment as above of the unpaid purchase money a deed for the property shall be executed at the vendee's expense by the vendor, which shall convey a good and merchantable title to the property to the vendee, taxes, ground rent, water rent, and all other encumbrances to be allowed for or adjusted between the parties to the date of settlement.

"Witness our hands and seals.

"A. S. Johnson          (Seal)
per J. H. Bundy, Agent  (Seal)
"Samuel E. Robinson.    (Seal)

"Test."

The bill, which was filed against Annie S. Johnson and John B. Johnson, her husband, after alleging that the plain-

tiff entered into the "contract with the defendants through
their agent, J. H. Bundy," then states that the plaintiff
placed the matter in the hands of his attorney, Thomas
Charles Williams, for the purpose of having the title ex-
amined, and that because of the great number of real estate
transactions then taking place in Baltimore City, his attorney
was unable to finish the examination of the title within the
sixty days mentioned in the contract; that on the 30th of
July, 1919, the defendants appeared in the office of said at-
torney and "then and there gave their assent to an extension
of time for the settlement of said property"; that on the 7th
of August, 1919, the plaintiff notified the defendants that he
was ready and willing to settle for the property and requested
them to be present at the time of said settlement, to wit:
Monday, August 11th, at 1 P. M., but that the defendants
failed to appear, and that he believes and avers that they do
not intend to execute a deed to him for said property.

The answer of the defendants admitted that they, through
their agent, J. H. Bundy, on or about the 29th of May, 1919,
agreed to sell the property to the plaintiff for the price named
in the bill and in the alleged agreement filed therewith, but
averred that the alleged contract filed with the bill was not
a true copy of the agreement, in that it did not contain cer-
tain interlineations made by the defendants, as appeared from
the duplicate of said agreement filed with their answer; that
said interlineation related to the time of payment of the
balance of the purchase-money and was as follows: "Cash on
date of transfer and the date of transfer to be understood to
be within thirty days." The answer further alleges that, for
some reason unknown to the defendants, settlement for the
property was not made within thirty days from the date of
said agreement "as they desired and stipulated," or within
sixty days from the date of the contract as stipulated in the
alleged copy of the contract filed with the bill; that the de-
fendants "stipulated for the time of settlement" because of
the difficulty of renting property "under indefinite and un-

certain conditions as to the ownership of property," and that
by reason of the failure of the plaintiff to comply with the
terms of the agreement they suffered loss, because their ten-
ants became aware of the pending sale of the property and
"vacated the same at the first opportunity"; that the defend-
ants went to Baltimore on the 29th of July for the purpose of
closing the matter and receiving the balance of the purchase-
money, but were there informed by plaintiff's counsel that
the sale could not be concluded for a week or ten days, and
they were "then requested to sign some instrument of writ-
ing," which they refused to do; that they did not assent to
any extension of time, but, on the contrary, when they were
advised that the settlement could not be made, they told the
plaintiff that the deal was off, and they returned to Hagers-
town.

The plaintiff called J. H. Bundy as a witness, and he tes-
tified that he was in the real estate business; that a nephew
of Annie S. Johnson, named Davis, told him that she wanted
to sell the property; that he told Davis that he had a pur-
chaser for the property, named Montell; that Montell looked
through the house and offered $1800 for it, but that Annie
S. Johnson refused to sell it for $1800; that he subsequently
got an offer of $2100 for the property, but she refused to take
that, and that he told Davis he should let him know if she
sold the house; that he went to see the plaintiff and asked
him if he wanted the property; that after looking through
the house the plaintiff told him that he would give $2100 for
it, but that witness told him he could not get it for that; that
plaintiff then told him that he would give him a check "for
$50 deposit on the house," and that if she would accept he
would take it for $2200; that he, witness, then drew up the
contract filed with the bill, and he signed it as agent, and the
plaintiff signed it, and he then sent it and the check to Annie
S. Johnson in Hagerstown to see if she would approve or
accept it, and that when it came back to him it was "just as it
is there," that is, like the copy filed with the bill, which was

"an exact copy." On cross-examination he testified that Davis authorized him to sell the house, told him that Annie S. Johnson wanted to sell it; that he sent the contract to the defendant, Annie S. Johnson, for her approval, and did not know whether she would accept it or not, that it was sent to her for her approval or rejection, and that when the defendant returned the contract to him it contained the interlineation to which we have referred, and that he then gave the contract to the plaintiff on the day he received it; that he did not communicate with Annie S. Johnson after the contract was returned to him, and did not see her again until he saw her at the office of counsel for plaintiff on July 30th, when she came to Baltimore to receive the money for the property; that on July 30th counsel for plaintiff told the defendants that he was not ready to settle that day, but that they could sign the deed and then return to Hagerstown, and that he would be ready in a few days, but that John B. Johnson then said that if they could not settle that day the deal was off; that they all then left the office of counsel for plaintiff and went to the elevator, and that while they were at the elevator Annie S. Johnson said to the plaintiff, "You come to the house and it will be all right and I will fix the matter with you." On re-examination he said that after he received the contracts from the defendants he did not write them that plaintiff had accepted it, and that the only thing he wrote them after the contract was returned to him was when he wrote them what day to come down to Baltimore for a settlement.

The plaintiff testified that he never met the defendants until the 30th of July, 1919, when he met them at his counsel's office, and that the entire negotiations had been carried on through J. H. Bundy; that after he got the contract back he went to see his attorney and told him about it, applied to him for a loan on the property, and authorized him to make an examination of the title; that he did not hear anything further from Bundy or the defendants until a few days

before the 29th of July, when Bundy told him that the defendants would be down on that day for a settlement, and that he then notified his counsel to that effect; that he met the defendants and Bundy at his counsel's office on the 30th of July; that his counsel then said that he was not quite ready, that he was waiting for the lien sheets from the city hall; that John B. Johnson said they wanted to settle that day, and that his counsel told him that everything was ready except the lien sheets and that if the defendants would sign the deed they could go, and as soon as he got the lien sheets they could get the money, but that John B. Johnson said the deal was off; that they all then left his counsel's office, and that John B. Johnson told him that if he was buying the property for himself he could let him know when the papers were ready, but that if he was buying it for his counsel the deal was off; that he told Annie S. Johnson that he could not say definitely when he would be ready to settle, but that he would let her know as soon as his counsel notified him, and that she said "that would be all right," and told him to meet her that night, but that instead of meeting her at the time appointed he called her up and she told him to see her counsel, "Mr. McGwinn," if he desired any further information; that the next thing he did, after he was told by his counsel that he was ready, was to notify John B. Johnson by registered letter that they would be ready to settle; that in accordance with said notice he went to his attorney's office on August 11th, but that the defendants did not appear; that he then went immediately to McGwinn's office and asked him what he was going to do about it, and that he replied that he was not going to do anything until he heard from the defendants, and that he then told McGwinn that if they were not there by 10 o'clock the next morning he would proceed to file a bill. On cross-examination he said he did not know why he did not go to see Annie S. Johnson the night of July 29th instead of calling her up by phone, and that he knew that the defendants lived in Hagerstown.

He further testified on cross-examination as follows: "Q. When this contract was presented to you, did you see that it had interlineations in lead pencil? A. Yes, sir. Q. Was that your agreement? A. No, sir; I didn't purchase on the thirty days' contract; I signed the agreement sixty days' contract. Q. Did you sign the agreement before it came from Mrs. Johnson? A. Yes, sir; the agreement was all made up and came back to me altered. Q. Had Mr. Bundy told you that the agreement would be sent up here for Mrs. Johnson's approval? A. Yes, sir. Q. And when it came back there was an interlineation in it and you didn't make any inquiry about it? A. Yes, sir. Q. From whom? A. Mr. Bundy asked me to get my money under the thirty day contract, get my money immediately. Q. Then if Mrs. Johnson was insisting upon it being settled within thirty days and you were insisting that it be settled in sixty days. A. The agent agreed; that is the only party I know in the matter. Q. And when you signed the contract you knew the agent would have to submit it for approval? A. Yes, sir. Q. Then you took it according to your notion as to the time, sixty days, when you knew that it came back to you interlined, providing for settlement within thirty days, that is a fact? A. I didn't accept it on those terms. Q. You saw the contract after it came back after it had been submitted for approval or disapproval, and you saw then that it had been changed and without making any further inquiry? A. I made further inquiry. Q. Where? A. When I seen the lead pencil interlineation, I said I don't want it; get me my check, my fifty dollars. Mr. Bundy informed me that the sixty days was all right. Q. So far as you and Mrs. Johnson were concerned, you never did get together on whether it was a thirty days or a sixty days' contract? A. I wasn't dealing with Mrs. Johnson. Q. You were concerned that it should be sixty days? A. Nothing less. Q. You knew that Mrs. Johnson had interlined not less than thirty days? A. Yes. Q. Then there was distinct negotiations on that proposition between

you; you were contending for one time and she another? A. I got my time through the agent; we agreed on our time. Q. (By the Court) When you were insisting on the sixty days, knowing that Mrs. Johnson had inserted thirty days there, what information did you get as to whether or not Mrs. Johnson agreed to the sixty days? A. I don't know nothing about what they agreed. Q. (By the Court) Did you ever get any information on that? A. Got it from Mr. Bundy. Q. What information? A. I throwed the contract back—give me—I wouldn't have it for thirty days; just give me my money. He said, it is all right, I am acting for them, what I do is all right."

Annie S. Johnson testified that she lived in Hagerstown, and that the property in question belonged to her; that she never authorized Bundy to sell the property, but that he sent her the two contracts with the check for fifty dollars, and that when she received them she took them to an attorney to find out whether it was necessary for her to sign them as her name had already been signed to the contracts, and she took the check to the bank to find out if it was good; that her husband made the interlineation in the contracts at her request, making the date of transfer and settlement thirty days instead of sixty days because she wanted the time of settlement and transfer shortened so as not to have her tenants in the house annoyed and dissatisfied so long, for fear that they would become so dissatisfied that they would leave the property before she could do anything with it; that she returned one of the contracts as altered by the interlineation with a letter to her nephew, Avon W. Davis, and that she did not hear anything further about it until she got a letter from Bundy about the latter part of July, and that she accordingly went down to Baltimore on July 28th to close the matter and that her husband came down the next day; that on the 30th of July they went to the office of plaintiff's counsel to close the matter and receive the purchase-money; that when they met there counsel for plaintiff said he was not

ready, that it would take him two or three days to get ready, but that they, the defendants, could sign the papers and go back home; that when she asked the attorney why it had taken so long, he replied that he was not talking to her but to his client, who knew more about the business than she did; that her husband then told the attorney that he did not come down to Baltimore to sign the papers but to close the deal, that he did not know what the papers were, but that if they were not ready the deal was off and that he was going home that afternoon, and said to her "come on," and they left the office. She and her husband positively denied that either of them made any arrangement or agreement to extend the time of the settlement, or that they were asked to do so, and she further testified that her husband went back to Hagerstown that afternoon on the 3 o'clock train and she remained in Baltimore about a week; that the plaintiff did not talk to her over the telephone that day, and did not call her up. The testimony of John B. Johnson was substantially to the same effect.

The appeal is from the decree of the Court below denying the relief prayed and dismissing the bill, and the evidence to which we have referred leaves no doubt as to the correctness of that conclusion. The appellant insists that whether the date of settlement under the contract in question was thirty or sixty days, the time of settlement was not of the essence of the contract. The general rule in equity is that a stipulation as to time of payment of the purchase price is not regarded as a condition which requires strict performance to entitle a vendee to have the sale consummated. But this general rule is subject to the qualification that a purpose to make time of the essence of the contract may be disclosed by its terms, or by the circumstances and object of its execution and the conduct of the parties, and that "in every instance it is a question of intention to be determined upon the facts of the particular cace." *Acme Bldg. Co.* v. *Mitchell,* 129 Md. 406. In the case at bar *both parties* treated the stipu-

lation as to the time of settlement as a matter of vital importance, and there is no satisfactory evidence of a waiver or assent on the part of the defendants to an extension of the time. Unless, therefore, parties are to be denied the right to contract as they please, it would be difficult to hold that it was not the *intention* of the parties in this case to make the time of settlement an essential feature of the contract. That, however, is not the question here. The defendants' answer was in effect a denial of the execution of the contract sued on and sought to be enforced, and the undisputed evidence is that the defendants refused to approve and adopt the contract executed by Bundy as their agent, and that when they altered or changed it by interlineation so as to make it conform to the contract which they were willing to make, the plaintiff, who knew that Bundy had no authority to make a contract for them, refused to accept it or to assent to such alteration until Bundy, who had no authority to do so, assured him that he could disregard the alteration made by the defendants. It is evident, therefore, that the defendants never became parties to the contract submitted by the plaintiff, and that the plaintiff never assented to the contract altered by he defendants, and that there was in fact no contract at all. Of course, the evidence shows that the plaintiff was willing to buy the property for $2200, and that the defendants were willing to sell it at that price, but it also shows that they never reached an agreement upon the terms of sale, and that there never was a complete agreement for the sale of the property. It is said in 9 Cyc, 245, "There can never be a contract in the true sense, * * * in the absence of the element of agreement, or mutual assent of the parties," and on page 267 of the same volume it is said, "An acceptance, to be effectual, must be identical with the offer and unconditional. Where a person offers to do a definite thing and another accepts conditionally or introduces a new term into the acceptance his answer is either a mere expression of willingness to treat or it is a counter proposal, and in neither case is there an agreement."

We do not mean to say that it is requisite for a contract of sale that the time of payment be specified. On the contrary, where there is no such stipulation it will be presumed that the parties intended payment to be made within a reasonable time. But where parties attempt to contract with reference to a sale of property and the terms of such sale, and the negotiations reach no further than an offer and a counter proposal, neither of which are accepted, there is no agreement or contract upon which an action at law or suit in equity may be based.

In this view of the case it is not necessary to consider other questions presented by the record, further than to refer to the fact that the alleged contract was not signed by John B. Johnson, or by any one for him, and to the further fact that the only offer to contract with which he was at all connected was the offer contained in the altered contract returned to the plaintiff, and which the plaintiff refused to accept.

*Decree affirmed with costs.*