895 A.2d 1101

Eileen W. NORKUNAS

v.

Rebecca COCHRAN, et al.

No. 0094, Sept. Term, 2005.

Court of Special Appeals of Maryland.

April 10, 2006.

John C. Moffett, Gaithersburg, for appellant.

James L. Mayer, Columbia, for appellee.

Panel: SALMON, MEREDITH, WILLIAM W. WENNER (Retired, Specially Assigned) JJ.

MEREDITH, J.

In this case we shall hold that the Circuit Court for Baltimore City erred in entering an order for specific enforcement of a letter of intent and an alleged contract for the sale of real estate.

Eileen Norkunas, appellant, is the owner of certain residential property known as 835 McHenry Street, Baltimore City, Maryland 21230. The appellees, Robert and Hope Grove, and Robert and Rebecca Cochran, approached Ms. Norkunas and expressed their interest in purchasing the property. Assisted by a real estate agent, the four hopeful buyers gave Ms. Norkunas a handwritten letter of intent that spelled out key terms of an offer they intended to present, together with a check for a $5,000 deposit. The text of the letter of intent is as follows:

3/7/04

LETTER OF INTENT

We, Rebecca Cochran, Robert Cochran, Hope Grove and Robert Grove, Buyers—offer to buy 835 McHenry Street, Baltimore, Md. 21230 for $162,000. Payment by $5,000 check, this date and $157,000 by certified or cashiers funds not later than April 17, 2004.

A standard form Maryland Realtors contract will be delivered to Seller within 48 hours. Seller to pay only 1/2 normal transfer taxes and a 3% commission to Long & Foster. All other costs of closing to be paid by buyers.

The contract will contain a financing requirement for buyers, but buyers will guarantee closing and not invoke the financing contingency.

We will delete the standard home inspection contingency.

[written in margin:] Buyer to honor Seller's lease and offer tenants any renewal up to 12 months.

The letter of intent was signed by the Groves and the Cochrans under "Buyers," by Ms. Norkunas under "Seller," and by Brian Best under "Agent."

Within a day or so after signing the letter of intent, Ms. Norkunas received a package of documents from the buyers' real estate agent. The package included a cover letter that stated:

Dear Ms. Norkunas,

It was a pleasure meeting you yesterday. Enclosed with this folder are all the documents needed to complete the sale of your home. The basic Real Estate contract, along with a couple of documents I need you to fill out to ratify the contract. The first is a Disclosure/Disclaimer. You can either fill out the first 3 pages (the Disclosure) or you can just sign the last page (the Disclaimer). Also included is a property fact sheet. This is just basic information on the property that needs to accompany the contract. The Groves and the Cochrans are so excited about your home. If you have ANY questions please feel free to call me or have someone near you look over the contract. Rest assure[d] that we want this to go as smooth as possible for you and both the Groves and Cochrans asked me to tell you if there is anything they can do please feel free to ask. I look forward to hearing from you.

You can either fax me the contract and disclaimer back or I[']ll include a Fed–X envelope for you to send back.

Thank you again[.]

The package of documents ("the buyers' offer") contained a number of pre-printed forms, including a form titled Residential Contract of Sale, published by the Maryland Association of Realtors®, together with 10 or more form addenda. Many of

the addenda appear to be forms published by the Maryland Association of Realtors®. At least one of the addenda appears to be a form that the buyers' broker developed. Some of the documents had blanks filled in or altered by the buyers. The price and description of the property were the same as in the letter of intent. The form financing contingency had been filled in with details. A separate Property Inspections contingency addendum was included, but appears to have been struck through as promised in the letter of intent.

Ms. Norkunas never did return the documents to the buyers or their agent. Nor did she otherwise communicate to the buyers or their agent that their offer had been accepted. After a week or so had passed, the buyers were eventually told that Ms. Norkunas was "taking the property off the market."

The buyers filed suit seeking specific performance of the letter of intent. During the process of discovery, the buyers learned for the first time that Ms. Norkunas had, in the privacy of her home, signed the documents comprising the buyers' offer. Ms. Norkunas had struck through two paragraphs relating to the financing contingency, and had made some other marks on the documents. At her deposition, Ms. Norkunas explained:

> I was probably going through it at the time and kind of getting overwhelmed the more I went through it and questioning parts and kind of scratching out some parts. This was what I thought was going to be my counteroffer. I signed what I thought was going to be a counteroffer, and then it just got so overwhelming, it was too much. It was just too much.

> \* \* \*

> [Buyers' counsel] What in the contract form that was sent to you, Exhibit 3, were terms that were not contained in the original offer as you state.... What in the contract contained new terms that were not in the original offer?

A.  I think the financing. . . . Page 4 of 9, Paragraphs 20, 21.

Q.  Those are the ones you in fact crossed out; right?

A.  Yes. I was really—I don't know if this adheres to your same question, but I was really very conflicted about who was representing me in this deal, very conflicted.

Q.  Well, did you call Mr. Best or anybody involved in that document, the letter of intent and the contract, and say there are new terms here that aren't in the original offer; I think they should be taken out?

A.  No, I didn't say that. I was just getting so over my head and I wasn't being represented. I knew I was making a big mistake, and I just changed my mind. I said I can't do this. I can't do this.

After learning at Ms. Norkunas's deposition that she had privately signed the offer that had been transmitted to her, the buyers filed an amended complaint in which they asked the court to order "[t]hat the Letter of Intent and Contract of Sale between the parties be specifically enforced." The parties filed cross motions for summary judgment. They stipulated that "the [buyers] were not aware that [Ms. Norkunas] signed (and crossed out paragraphs 20 and 21 of) the Residential Contract of Sale dated March 7, 2004 until a copy of the Contract was produced by [Ms. Norkunas] through discovery in these proceedings." The buyers also filed an affidavit asserting that the changes Ms. Norkunas had made to the unreturned contract documents would have been acceptable to the buyers.

The Circuit Court for Baltimore City granted summary judgment for the buyers. No separate opinion of the circuit court is included in the record, but the order granting summary judgment in favor of the buyers states the court was ordering specific performance because "the Letter of Intent and the Maryland Standard Residential Contract signed by all parties constitute the contract in this case and together they constitute an enforceable contract for sale." Accordingly, the court ordered that Ms. Norkunas "is to settle the property

known as 835 McHenry Street in Baltimore, Maryland with Plaintiffs pursuant to the terms of the executed contract within 60 days...." Ms. Norkunas noted an appeal. Because we conclude the circuit court erred in determining that there was an enforceable contract, we will vacate the order of the circuit court that granted summary judgment for the buyers.[1]

## Analysis

As the Court of Appeals stated in *Della Ratta v. Larkin,* 382 Md. 553, 563, 856 A.2d 643 (2004), "[w]hen reviewing a grant of a motion for summary judgment, our task is to determine whether any genuine dispute of material fact was shown to exist and, if not, whether the Circuit Court was legally correct." *Accord de la Puente v. Frederick County,* 386 Md. 505, 510, 873 A.2d 366 (2005). In this case, there is no genuine dispute regarding the facts as to what happened. Accordingly, our task is to determine whether the motion court properly applied the law to the facts of this case. We review the motion court's legal conclusions *de novo. Id.*

### 1. The Letter of Intent

■    Before the buyers discovered that Ms. Norkunas had secretly signed their multiple-form offer to purchase her property, the buyers sued for specific enforcement of the handwritten letter of intent. After discovering that Ms. Norkunas had also signed the unreturned detailed offer, the

---

1.   After Ms. Norkunas filed her notice of appeal from the order granting the buyers' motion for summary judgment, the buyers moved to dismiss the appeal, alleging the order did not fully dispose of all claims, such as ancillary damages and attorneys' fees. Ms. Norkunas responded that the court's order was immediately appealable pursuant to Maryland Code (1973, 2002 Repl.Vol.), Courts and Judicial Proceedings Article, § 12–303(3)(v), which authorizes an interlocutory appeal from "[a]n order ... [f]or the sale, conveyance, or delivery of real or personal property...." We agree with the appellant that the circuit court's order was appealable pursuant to this provision. *See Winkler v. Jerome,* 355 Md. 231, 245, 734 A.2d 212 (1999). *Cf. Rustic Ridge v. Washington Homes,* 149 Md.App. 89, 96, 814 A.2d 116 (2002) (no right of interlocutory appeal where order granting partial summary judgment did not order sale or conveyance).

buyers filed an amended complaint that alleged in a single count that both the letter of intent and the subsequently tendered Realtors℗ contract were enforceable. In the amended complaint, the buyers prayed "[t]hat the Letter of Intent and Contact of Sale between the parties be specifically enforced."

The parties filed cross motions for summary judgment. In support of the buyers' claim that the court should enter summary judgment in their favor, the buyers asserted that "the letter of intent was in writing, named the parties to the contract, described the property in question with sufficient detail, set forth the terms and conditions of the contract between the parties and was signed by the parties. Thus as soon as [Ms. Norkunas] executed the letter of intent it was a valid and enforceable contract." Citing *Beall v. Beall,* 291 Md. 224, 228–29, 434 A.2d 1015 (1981), the buyers repeat that assertion in their brief, and continue to argue that "[t]he actual meeting of the minds occurred when the Letter of Intent was executed," and, as a consequence, "the moment [Ms. Norkunas] signed the Letter of Intent she completed the legal requirements for a written contract for the sale of the property in question." Although it would be possible for parties to memorialize an enforceable contract in a letter after they had in fact come to a meeting of the minds on all terms of their agreement, the language of the letter signed by Ms. Norkunas does not support the buyers' contention that these parties had reached a final agreement of sale as of the time the letter was signed.

In *Burbach Broadcasting Co. of Del. v. Elkins Radio Corp.,* 278 F.3d 401, 406 (4th Cir.2002), the court observed:

Letters of intent have led to much misunderstanding, litigation, and commercial chaos. 1 Corbin on Contracts § 1.16 (1993). Courts have expressed reservation concerning the binding nature of "letters of intent" because traditionally, the purpose and function of a preliminary letter of intent has been to merely provide the initial framework from which the parties might later negotiate a final binding agreement. *See A/S Apothekernes Laboratorium v. I.M.C.*

*Chemical Group, Inc.,* 873 F.2d 155, 158 (7th Cir.1989). Calling a document a "letter of intent" implies, *unless circumstances suggest otherwise,* that the parties intended it to be a nonbinding expression in contemplation of a future contract. As is commonly the case with contract disputes, prime significance attaches to the intentions of the parties and to their manifestations of intent. *Teachers Insurance and Annuity Assoc. of America v. Tribune Co.,* 670 F.Supp. 491, 497 (S.D.N.Y.1987). Labels such as "letter of intent" or "commitment letter" are not necessarily controlling, although they may be helpful indicators of the parties' intentions. *Id.*

The court noted in *Burbach* that, "[w]hile bare-boned 'agreements to agree' are not binding, courts have recognized two kinds of preliminary agreements that are binding and enforceable." *Id.* at 407. The court identified the two types of enforceable preliminary agreements as (1) agreements that reflect the "parties have reached a complete agreement (including the agreement to be bound) on all issues perceived to require negotiation"; and (2) agreements that contain a binding commitment to negotiate in good faith. *Id.*

The buyers in this case contend that the letter of intent signed by Ms. Norkunas falls into that first category of enforceable agreement, and that it therefore required no further formalization. When we analyze the language of the letter of intent, however, we find that the parties merely agreed that the buyers would submit a more detailed formal offer. *Cf.* Restatement (Second) of Contracts § 27 (1981) ("Manifestations of assent that are in themselves sufficient to conclude a contract will not be prevented from so operating by the fact that the parties also manifest an intention to prepare and adopt a written memorial thereof; but the circumstances may show that the agreements are preliminary negotiations.").

The Court of Appeals summarized the relevant principles governing our interpretation of contract documents in *Myers v. Kayhoe,* 391 Md. 188, 198, 892 A.2d 520 (2006), stating:

Under Maryland law, the interpretation of a contract, including the question of whether the language of a contract is ambiguous, is a question of law subject to *de novo* review. *See Towson v. Conte*, 384 Md. 68, 78, 862 A.2d 941, 946 (2004). We have long adhered to the objective theory of contract interpretation, giving effect to the clear terms of agreements, regardless of the intent of the parties at the time of contract formation. *Id.* at 78, 862 A.2d at 946–47. Under the objective theory:

"A court construing an agreement under [the objective theory] must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed. In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant."

*Dennis v. Fire & Police Employees Ret. Sys.*, 390 Md. 639, 656–57, 890 A.2d 737 (2006) (quoting *General Motors Acceptance v. Daniels*, 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985) (internal quotations omitted)).

The buyers argue that a reasonable person in the position of Ms. Norkunas should have known when she signed the letter of intent that she had already sold her home to these buyers, and that there would be no further negotiations and no opportunity for her to further consider whether she wanted to sell her property upon the terms set forth in the letter. The plain language of the letter, however, simply does not say that.

In *Goldstein v. Miles*, 159 Md.App. 403, 431, 859 A.2d 313 (2004), *cert. denied*, 384 Md. 581, 865 A.2d 589 (2005), we noted that in order "[f]or a promise to establish an 'enforceable contract [it] must express with definiteness and certainty the nature and extent of the parties' obligations.' " (Quoting

*Kiley v. First Nat'l Bank,* 102 Md.App. 317, 333, 649 A.2d 1145 (1994), *cert. denied,* 338 Md. 116, 656 A.2d 772, *cert. denied,* 516 U.S. 866, 116 S.Ct. 181, 133 L.Ed.2d 120 (1995).) In the first paragraph, the letter of intent states that the buyers "offer to buy" the property, but there is no statement anywhere in the letter that could be construed as a statement that Ms. Norkunas agrees to accept the offer or agrees to sell the property upon the terms set forth. The letter states that a "standard form Maryland Realtors contract will be delivered to Seller." The letter further states that "[t]he contract will contain . . ." certain language, and that other language "will" be deleted from the contract. In our view, a reasonable person in the position of a seller who was approached by buyers indicating they wanted to purchase her home would have understood the letter of intent to mean that a formal contract offer would soon follow. The reasonable person in Ms. Norkunas's position would have understood that these buyers wanted her to know the terms they were prepared to offer and that they were very seriously interested in purchasing the property. The terms of this letter would not communicate to such a seller, however, that if she signed this document she was irrevocably locked into a contract of sale.[2]

We reject the notion that, under these circumstances, the letter of intent itself constituted a binding contract. "There was, at best, an agreement to agree in the future . . . and this is not a sufficient basis for a specifically enforceable contract." *Grooms v. Williams,* 227 Md. 165, 172, 175 A.2d 575 (1961).

---

**2.** The delivery of the referenced check for $5,000 does not elevate the letter beyond the status of an offer. It is customary for most real estate offers to be accompanied by a check tendered as a good faith deposit or "earnest money." The typical residential form contract now includes language similar to Paragraph 22 of the Realtors® form used in this case that authorizes the broker for the seller to delay negotiating the deposit check until the offer has been accepted, and then deposit the check into an escrow account pending closing. The seller does not accept the offer merely because of taking possession of the check for a deposit. Moreover, the buyers did not allege, either in their complaint or in the documents filed in connection with the cross motions for summary judgment, that Ms. Norkunas ever negotiated the $5,000 check that accompanied the letter of intent.

*See Horsey v. Horsey,* 329 Md. 392, 420, 620 A.2d 305 (1993) ("it is generally held that an 'agreement to agree' is unenforceable"); *Peoples Drug Stores v. Fenton,* 191 Md. 489, 495, 62 A.2d 273 (1948)("by their correspondence . . . [the parties] were only settling the terms of an agreement into which they proposed to enter after the particulars were completely adjusted"); *First Nat'l Bk. v. Burton, Parsons & Co.,* 57 Md. App. 437, 450, 470 A.2d 822 (1984) ("The overwhelming weight of authority holds that courts will not enforce an agreement to negotiate a contract.").

The letter of intent did not contain any commitment by Ms. Norkunas to sell her property to the buyers upon the terms they indicated they would include in a more formal offer to follow. Her signature did nothing more than acknowledge that she was aware of the letter of intent. As appellees themselves acknowledged in their brief, "[a]ppellees agree that the parties from the beginning contemplated that a formal written contract would follow their informal Letter of Intent." Accordingly, the letter of intent was not an enforceable contract that obligated Ms. Norkunas to sell the 835 McHenry Street property to the buyers.

### 2. The form contract

■ The buyers argue, in the alternative, that even if the letter of intent was not an enforceable contract, the buyers' formal offer as expressed in the subsequent package of documents became a binding enforceable contract when Ms. Norkunas placed her signature on the documents. We do not agree that there has been irrevocable acceptance when an offeree privately signs an offer but then decides not to communicate her acceptance to the offeror. It is apparent that Ms. Norkunas had second thoughts about the advisability of this transaction, and she never communicated to the buyers or their agent that she had signed the buyers' offer. We do not agree, however, that the buyers' offer was transformed into a contract the instant that the offeree privately signed the offer.

In *Reserve Insurance v. Duckett,* 249 Md. 108, 238 A.2d 536 (1968), the Court of Appeals noted that Maryland has long followed the rule known as the "postal acceptance rule" or "The Rule in *Adams v. Lindsell* [1, Barn. & Ald. 681, 106 Eng. Rep. 250 (1818, King's Bench)]" for determining when an offer received via mail has been accepted. The Court noted, 249 Md. at 117, 238 A.2d 536:

By sending the offer by mail and enclosing a self-addressed envelope for the return of the premium payment, Reserve [the offeror] designated the method of acceptance, *i.e.,* by mail. The well established rule is that in the absence of any limitation or provision to the contrary in the offer, the acceptance of the offer is complete and the contract becomes binding upon both parties when the offeree deposits the acceptance in the post box. This rule was originally promulgated in the leading case of *Adams v. Lindsell, supra,* and has been generally adopted by the highest courts of appeal in the United States. This rule was adopted in Maryland by this Court in *Wheat v. Cross,* 31 Md. 99 (1869).

In *Reserve,* the Court noted that the rule had been criticized by some modern commentators, but it nevertheless concluded that continued adherence to the postal acceptance rule was appropriate, stating, *id.* at 118, 238 A.2d 536:

Professor Corbin, after reviewing the logical difficulties which the rule presents and the considerations of policy for and against the continuation of the rule, concludes that it is probably wiser to continue it. He aptly stated in 1 *Corbin,* § 78, page 337:

"One of the parties must carry the risk of loss and inconvenience. We need a definite and uniform rule as to this. We can choose either rule; but we must choose one. We can put the risk on either party; but we must not leave it in doubt. The party not carrying the risk can then act promptly and with confidence in reliance on the contract; the party carrying the risk can insure against it if he so desires. The business community could no doubt adjust itself to either rule; but the rule throwing the risk on the offeror has the merit of closing the deal more

quickly and enabling performance more promptly. It must be remembered that in the vast majority of cases the acceptance is neither lost nor delayed; and promptness of action is of importance in all of them. Also it is the offeror who has invited the acceptance."

*Accord* 2 WILLISTON ON CONTRACTS §§ 6:32 *et seq.* (4th ed., Richard A. Lord, 1991) ("It was long ago decided that the contract was completed upon the mailing of the acceptance, the early courts evidently reasoning that when the acceptance was mailed, there had been an overt manifestation of assent to the proposal.") (footnote omitted).

The analogous rule for when acceptance takes effect appears in the RESTATEMENT (SECOND) OF CONTRACTS (1981) in Section 63, which states:

Unless the offer provides otherwise,

(a) an acceptance made in a manner and by a medium invited by an offer is operative and completes the manifestation of mutual assent as soon as put out of the offeree's possession, without regard to whether it ever reaches the offeror; but

(b) an acceptance under an option contract is not operative until received by the offeror.

*Accord* 17A AM.JUR.2D *Contracts* § 69 (2005)("To create a contract, an acceptance of an offer must be communicated to the offeror; a mere secret intent to accept is not sufficient."). *See also* RESTATEMENT (SECOND) OF CONTRACTS § 56 ("it is essential to an acceptance by promise either that the offeree exercise reasonable diligence to notify the offeror of acceptance or that the offeror receive the acceptance seasonably"); RESTATEMENT (SECOND) OF CONTRACTS § 102 (in the case of contracts under seal, "A written promise is delivered unconditionally when the promisor puts it out of his possession and manifests an intention that it is to take effect at once according to its terms."); *Baker v. Dawson,* 216 Md. 478, 485, 141 A.2d 157 (1958)("When [counter-offeree] approved the changes (and initialed them) and so accepted the counter offer ***and notice of his acceptance was communicated to the [counter-***

*offerors],* ... the contract was made.")(emphasis added); *James L. Kernan Co. v. Cook,* 162 Md. 137, 142, 159 A. 256 (1932)("to complete this offer of a bilateral contract the acceptance of the offeree requires communication to the offeror before the offer is terminated by revocation by the offeror"); *Huse v. Reed,* 157 Md. 504, 509–10, 146 A. 579 (1929) (where offerees transmitted signed acceptance to their own attorney for his delivery to offeror's agent, acceptance was complete when the attorney showed the documents to offeror's agent). *Cf. Patton v. Graves,* 244 Md. 528, 531, 224 A.2d 411 (1966) ("contract was made" when seller's broker called buyer and told him seller had signed the contract offer as submitted); *Miller v. Herrmann,* 230 Md. 590, 595, 187 A.2d 847 (1963) (contract was binding, and counter-offerors could not withdraw, after counter-offeree communicated by telephone that the "unessential and relatively insignificant modification" to the original offer was accepted).

Commenting on the language in RESTATEMENT (SECOND) OF CONTRACTS § 63 that changes the effective time of acceptance from that point when the manifestation of assent is deposited in the mail box to that point when the assent is "put out of the offeree's possession," Williston states:

An acceptance is dispatched within the meaning of the rule under consideration when it is put out of the possession of the offeree and within the control of the postal authorities, telegraph operator, or other third party authorized to receive it. Under the traditional formulation of the rule, involving primarily the mails, mere delivery of an acceptance to a messenger with directions to mail it amounts to no acceptance until the messenger actually deposits it in the mail. Under the Restatement (Second) view, or presumably that adopted by the drafters of the Uniform Commercial Code, delivery even to a private messenger for redelivery to the offeror or, presumably, later deposit in the mails, will operate as a sufficient dispatch as long as the use of the nonpublic instrumentality would be usual and reasonable. The private delivery service, under the modern view, would have to be independent of the offeree, reliable both in terms

of its delivery obligations and record keeping, and, presumably, of a type that would customarily be used to communicate messages of this sort. Such agencies as the United Parcel Service, Federal Express, or even private messenger services in urban areas would qualify, and as soon as the communication leaves the offeree's possession and is placed with an authorized recipient of the instrumentality, an effective dispatch will be deemed to have occurred.

WILLISTON ON CONTRACTS, *supra*, § 6:37.

Applying these rules to the undisputed facts of this case, it is clear that, even if Ms. Norkunas's signature of the buyers' offer was intended to be an acceptance (as opposed to a counter-offer), acceptance would not have taken effect until the signed documents were either mailed by her (pursuant to The Rule in *Adams v. Lindsell* ), or until they were otherwise put out of her possession, for example by fax or transmittal to the buyers' agent (pursuant to the rule stated in RESTATEMENT (SECOND) OF CONTRACTS § 63(a)). The evidence was undisputed that she did neither, but rather, retained possession of the documents until being forced by the rules of discovery to permit her opponents to inspect and copy the papers.

Here, the buyers urge us to adopt a rule that considers the offeree's acceptance binding and irrevocable as soon as the offeree affixes her signature to the offer. We observe that such a rule could create more controversies than it resolved. Disputes regarding time of acceptance have, in many cases, arisen when the offeror attempted to withdraw an offer. *See, e.g., Wheat v. Cross*, 31 Md. 99, 103–04 (1869), in which the Court of Appeals noted that The Rule in *Adams v. Lindsell* provides, with clarity:

The offer may be withdrawn, and the withdrawal thereof is effectual so soon as the notice thereof reaches the other party; but if before that time the offer is accepted, the party making the offer is bound, and the withdrawal thereafter is too late.

It so happens that the buyers in this case had no desire to withdraw their offer. But if the buyers had had a change of

heart and decided to withdraw their offer to purchase Ms. Norkunas's property, they could have done so by delivering notice of such withdrawal to her at any time before she dispatched, either by mail or via fax or courier, the package of signed documents. By continuing to apply the Rule in *Adams v. Lindsell*, the courts provide a measure of objectivity in the process for determining when an offer may be withdrawn as well as determining when an offer is transformed into an enforceable contract.

Nevertheless, the buyers argue that delivery of the seller's acceptance was not essential to the formation of an enforceable contract of sale, citing *Beall v. Beall*, 291 Md. 224, 228–29, 434 A.2d 1015 (1981), *Porter v. General Boiler Casing Co.*, 284 Md. 402, 410, 396 A.2d 1090 (1979), and *Maryland Supreme Corp. v. Blake Co.*, 279 Md. 531, 541, 369 A.2d 1017 (1977). None of those cases supports the buyers' contention that there was an effective acceptance of their offer by Ms. Norkunas. The RESTATEMENT (SECOND) OF CONTRACTS § 69 describes the circumstances under which acceptance may be inferred from the silence of the offeree:

(1) Where an offeree fails to reply to an offer, his silence and inaction operate as an acceptance in the following cases only:

(a) Where an offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation.

(b) Where the offeror has stated or given the offeree reason to understand that assent may be manifested by silence or inaction, and the offeree in remaining silent and inactive intends to accept the offer.

(c) Where because of previous dealings or otherwise, it is reasonable that the offeree should notify the offeror if he does not intend to accept.

(2) An offeree who does any act inconsistent with the offeror's ownership of offered property is bound in accordance with the offered terms unless they are manifestly

unreasonable. But if the act is wrongful as against the offeror it is an acceptance only if ratified by him.

None of these circumstances is present in the case at hand.

Because the evidence was undisputed that Ms. Norkunas never transmitted to the buyers or their agent the documents she had marked up, we need not further analyze whether the changes made by her to the buyers' offer were of such significance to the transaction that her alleged acceptance was in fact a counter-offer. *Cf., e.g., Post v. Gillespie,* 219 Md. 378, 385–86 (1959)(purported acceptance on different terms was counter-offer and "there was no binding contract to be enforced"); *Ebline v. Campbell,* 209 Md. 584, 589–90, 121 A.2d 828 (1956)(a qualified acceptance is a counter-offer and rejection of original offer); *Robinson v. Johnson,* 137 Md. 610, 113 A. 121 (1921)(purported acceptance that shortened time for closing created no contract). *See also Binder v. Benson,* 225 Md. 456, 462, 171 A.2d 248 (1961)(where the buyers and sellers "negotiated at length by a series of offers and counter-offers, scratched out or interlined on a document already signed[,] ... a change in terms proposed since the party to whom it was offered had last seen the contract forms was not to be deemed accepted unless it was initialed, and there was to be no contract until all changes had been initialed by both sides"); RESTATEMENT (SECOND) OF CONTRACTS § 59 ("A reply to an offer which purports to accept it but is conditional on the offeror's assent to terms additional to or different from those offered is not an acceptance but is a counter-offer."); RESTATEMENT (SECOND) OF CONTRACTS § 61 ("An acceptance which requests a change or addition to the terms of the offer is not thereby invalidated unless the acceptance is made to depend on an assent to the changed or added terms."). In this case, Ms. Norkunas communicated nothing to the buyers until she advised them that she was taking her property off the market. Consequently, we need not determine whether the changes made by her to the documents would have required further assent from the buyers to complete formation of the alleged contract.

It is not clear from the record what became of the buyers' check for earnest money. Nor is it clear whether there are any further issues to be resolved by the circuit court in light of our holding that there was no enforceable contract for the sale of 835 McHenry Street. (See note 1, *supra.*) The buyers did not allege in the complaint or in their cross motion for summary judgment that Ms. Norkunas negotiated the $5,000 check, but if the deposit check was negotiated, the position asserted by Ms. Norkunas in this case provides no basis for her to refuse to return any funds she received from the buyers. Accordingly, we shall vacate the judgment and remand the case to the circuit court for further proceedings not inconsistent with this opinion, and for the entry of a final judgment.

**JUDGMENT VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEES.**