908 A.2d 644

DOE MOUNTAIN ENTERPRISES, INC.

v.

Gary R. JAFFE, et al.

No. 2199 Sept. Term, 2004.

Court of Special Appeals of Maryland.

Sept. 28, 2006.

2

John C. Moffett, Gaithersburg, MD, for Appellant.

Frederic J. Einhorn, Rockville, MD, for Appellee.

Panel: JAMES R. EYLER, SHARER and WOODWARD, JJ.

WOODWARD, Judge.

From September through November 1998, appellant, Doe Mountain Enterprises, Inc. ("Doe Mountain") sought to refinance its mortgage loan, which was then in default. Doe Mountain negotiated with appellee, Gary R. Jaffe, for such financing, and the negotiations culminated in a loan agreement, dated November 20, 1998, between Doe Mountain and JHR Funding, LLC ("JHR"). Within approximately six

months, Doe Mountain was in default of the new loan agreement, and, as a result, JHR took possession of Doe Mountain's property and obtained a confessed judgment for the unpaid balance of the promissory note. On December 8, 2000, Doe Mountain filed a complaint in Circuit Court for Montgomery County, alleging a variety of contract and tort claims against Jaffe, JHR, (which later merged into appellee, Bear Creek Mountain Real Estate, LLC ("Bear Creek"),[1]) appellee, Southern Management Corporation Retirement Trust ("Southern Management"),[2] appellee, David Hillman, and Michael D. Rubin.[3] By order dated November 5, 2004, the circuit court granted appellees' motions for summary judgment as to all claims of Doe Mountain, which ruling is the subject of this appeal. For the reasons set forth herein, we shall affirm the decision of the circuit court.

## BACKGROUND

Preliminarily, we shall identify the parties in this complex civil action. Doe Mountain is a Pennsylvania corporation that owned and operated a ski resort in Berk's County, Pennsylvania. William Buzbee bought stock in Doe Mountain in 1983 and became Doe Mountain's president and sole shareholder in 1990. He is an attorney licensed to practice law in Maryland, with ten years' experience as a real estate settlement attorney. JHR was a Maryland limited liability company created by Jaffe on October 1, 1998, to facilitate the loan transaction with Doe Mountain. Southern Management is a retirement trust, with Hillman as its trustee. Southern Management provided funds to JHR so that JHR could make the loan in question to Doe Mountain.

---

1. JHR changed its name to GRJ Funding, LLC on June 10, 1999. GRJ Funding, LLC then merged into Bear Creek on December 11, 2000.

2. Southern Management is referred to in the record by two other names, *to wit,* Southern Management Corporation Employment Retirement Trust and Southern Management Corporation Employees Retirement Trust.

3. Doe Mountain voluntarily dismissed Rubin early in the proceedings.

In the spring of 1998, Doe Mountain had a mortgage loan with CoreStates Bank, N.A. ("CoreStates"), which had been in default for several months. Indeed, throughout the 1990's, Doe Mountain was operating at a loss and had a history of defaulting on its mortgage obligations. The vice president of the bank, C.B. Cook, met with Buzbee to notify him that, because CoreStates was being bought out by First Union National Bank, CoreStates no longer wanted Doe Mountain in its portfolio and intended to sell the Doe Mountain mortgage loan. Cook informed Buzbee that the bank would give Doe Mountain a discount if it paid off its outstanding debt with CoreStates. Buzbee estimated that Doe Mountain needed $2,000,000.00 to pay off the mortgage loan and continue operating the ski resort.

In the summer of 1998, Buzbee sought financing from various sources to pay off the mortgage loan, but his efforts were fruitless. He stated in deposition testimony that he felt "desperate" because Doe Mountain was "behind the eight ball . . . for pre-season." Just before Labor Day 1998, Buzbee met with real estate broker Ray Romanick, who suggested that his father-in-law, Hillman, might give Doe Mountain a loan. Romanick reported back to Buzbee that Hillman was willing to loan him $1,000,000.00. Romanick then arranged for Buzbee to meet with Jaffe, as a source of financing for the other $1,000,000.00.

The first meeting between Buzbee, Jaffe, and Romanick took place in Jaffe's office in early September 1998.[4] Buzbee stated in his answers to interrogatories:

> When we first met with Gary R. Jaffe in the fall of 1998, we advised him of our opportunity to pay our bank off at a substantial discount. We told him that it was important to keep this information confidential and that if others found out about this we could lose this opportunity. Jaffe agreed with us.

---

4. Buzbee's daughter, Brenda Buzbee, was also present at this meeting.

In his deposition testimony, Jaffe confirmed that he understood Doe Mountain could pay off its mortgage loan at a substantial discount. The meeting concluded with Jaffe advising Buzbee that his investment company would investigate the status of the ski resort and the desirability of giving Doe Mountain a loan.

In the following days, Buzbee provided Jaffe with information on the ski resort, including tax returns, operating statements, inventory reports, and a property appraisal. Representatives of Doe Mountain met with Jaffe at least two more times before Romanick prepared two documents for Jaffe, Hillman, and Buzbee's execution.

The first document was entitled "COMMERCIAL MORTGAGE LOAN COMMITMENT" and it stated that Doe Mountain "hereby applies ... for a loan commitment ... based upon the terms and conditions set forth herein." Those terms provided for Jaffe and Southern Management, as the "Lender," to loan Doe Mountain $1,000,000.00 for a term of five years with a yearly interest rate of twenty percent. The stated purpose of the loan was for "the acquisition of existing first mortgage lien from First Union National Bank in the approximate amount of $3,000,000." The document imposed a duty of confidentiality on Doe Mountain and gave the Lender "the exclusive right to issue a commitment until the date which is 60 days from the date of submission of a complete loan package to Lender."

The second document mirrored the first one, with identical terms for a $1,000,000.00 loan, the duty of confidentiality on Doe Mountain, and the right of exclusivity for the Lender. The only difference was that the stated purpose for this loan was "Second Mortgage Financing." Apparently, Buzbee intended to use this money to pay vendors and open the resort in time for the upcoming ski season.

The parties agreed in the trial court that these two documents did not evidence loans themselves, but rather, only the

possibility of loans.[5]  This was indicated by the language contained in the documents that Doe Mountain was *applying* for mortgage loan commitments and by the language that the Lender had the exclusive right *to issue* the loans within sixty days.  In this Court, appellees describe the documents in their brief as "conditional loan applications [that] constituted letters of intent or preliminary term sheets outlining possible loan terms."  Doe Mountain concedes this point when it writes in its reply brief that the documents "may not have constituted commitments to provide the financing described therein." [6]

Buzbee brought the documents to two different attorneys, one in Pennsylvania and one in Maryland, both of whom advised him not to sign the documents.  Notwithstanding the advice of his attorneys, Buzbee signed them.  Jaffe and Hillman signed also, and the date of execution was noted as September 22, 1998.

An important turn of events occurred the following day, September 23, 1998.  Jaffe telephoned Cook at CoreStates and offered to buy Doe Mountain's mortgage loan directly from the bank for $1,000,000.00.  Buzbee was not aware of this phone call.  The next day, however, while meeting with Jaffe in Jaffe's office, Buzbee learned that Jaffe intended to buy the loan directly from the bank.  This arrangement, of course, differed from the original plan of loaning money to Doe Mountain so that it could pay off the loan with the bank.

---

**5.** In deposition testimony, Buzbee stated that when he signed the documents he believed they were more than applications for loans, based on the inclusion of the word "commitment" in the title of the documents.  Responding to questioning from appellees' counsel, however, Buzbee conceded that the documents were in fact applications.  The following colloquy exemplifies this:

Q.  Do you understand that at the time you signed this document you were applying for a loan?

A.  I understand that now.  Then I thought it was a commitment based on the title.

**6.** Nevertheless, Doe Mountain claims that these documents are "in fact contracts."  This contention is addressed in the discussion section of this opinion.

Buzbee stated in deposition testimony that he questioned the turnaround, but Jaffe responded: "[D]on't worry, we're still going to make the deal." Buzbee explained why he accepted the change in the following colloquy with his attorney:

Q. Just so I understand, what you thought was going to happen was that Mr. Jaffe and/or Mr. Hillman were going to purchase the loan which Doe Mountain had existing from [CoreStates] Bank?

A. Yes.

Q. I want to make sure it's clear on the record.

A. The understanding was that they would purchase the loan and pass on to me whatever they agreed to purchase it for. Then, we would make that as part of the new structured loan that they were going to come up with.

With Buzbee sitting in his office, Jaffe then telephoned Cook and offered to buy the Doe Mountain mortgage loan for $900,000.00. Jaffe also documented this offer in a letter to Cook dated September 24, 1998. Apparently, Cook balked at the offer, which was $100,000.00 less than Jaffe had offered the day before.

Over the next several days, Buzbee encouraged the bank to accept Jaffe's offer. The record indicates that Buzbee had more than one communication with Cook, including the following facsimile that Buzbee sent to Cook on September 27, 1998:

Several things have just been brought to my attention. One, I understand that the insurance company has been instructed to send the check to you for the damage caused by a storm/tornado earlier this year. That storm downed a lot of electric lines and poles. We have companies ready to start on Monday, but now without funds we have to cancel. We had to line them up several weeks in advance.

The Jaffe Group was concerned how we were going to get open. I explained that we were covered by insurance for the storm damage. They then wanted to know how much additional funds we would need in order to open. I explained that most of the suppliers would go along with us in

order to get us open. That would be their best bet for getting paid, however, the electric company would have to be paid $80,000 and a deposit made of approx. $6,000. We would have some salaries to pay for snowmaking and clean-up. It was estimated that we could get open for approx. $100,000. That is why they reduced their offer to $900,000 leaving me with $100,000 to get open.

I got your message Thursday morning and tried several times to contact you and left messages. Not being able to do so, is why I am sending you this fax.

C.B. I hope we can work something out. We have tried very hard to find lenders and/or come up with the money for you. When it appeared to be urgent we decided to accept the commitment for $1,000,000.00. After discussing with Gary Jaffe that it would be hard to open even with the 1 mil. loan and my discussing exactly what it would take bare minimum to open is when they came up with reducing their offer. I am hoping that maybe you will release the insurance funds and accept the $900,000.

Negotiations with the bank were ultimately successful. On October 1, 1998, Jaffe created JHR, and on October 13, 1998, JHR purchased the Doe Mountain mortgage loan from First Union National Bank for $950,000.00. The principal balance on the loan was $2,648,225.27 with accrued, unpaid interest of $305,060.84.

On November 2, 1998, JHR sent a commitment letter to Doe Mountain, in which it set out a restructured payment plan for the newly-acquired mortgage loan. This plan was significantly different, and less favorable to Doe Mountain, from the terms set forth in the loan documents executed by Buzbee, Jaffe, and Hillman on September 22, 1998. For example, under the new plan, JHR was entitled to the full amount owed on the original mortgage loan if Doe Mountain failed to make the required payments. It also included additional advances of $650,000.00 for working capital, $350,000.00 less than the amount set forth in the September 22, 1998 documents. The letter stated that JHR would "refrain from immediate action

to pursue collection of the Loan" if Doe Mountain accepted the terms of the restructuring. This letter also contained the following language:

By your signature below, you acknowledge that the Loan is in full force and effect and free from default by the lender; that the Loan is presently in default by [Doe Mountain]; that [Doe Mountain] has no defenses or set offs to the repayment of the Loan or the enforcement by the lender of its remedies set forth in the documents executed in connection with the Loan; that the full outstanding principle [sic] balance owing by [Doe Mountain] in connection with the Loan is [$2,953,286.11 as of 10/13/98]; and that no agreement presently exists between [Doe Mountain] and the lender (or their predecessors) with respect to the modification, compromise, or adjustment of the terms of the Loan. These statements are being made by you voluntarily and without any obligation of the lender to restructure the Loan.

Notwithstanding the obvious change in the terms of the loan transaction, Buzbee signed the letter on behalf of Doe Mountain. The letter was also signed by Jaffe on behalf of JHR. Buzbee asserted in his deposition that he did not have a choice but to sign the November 2 letter, because if he did not sign it, JHR "would have foreclosed immediately." Buzbee, however, admitted that he did not exert any effort to obtain alternative financing prior to signing the letter.

Immediately after signing the commitment letter of November 2, 1998, Buzbee attempted to renegotiate the terms of the loan set forth in that letter. On November 10, 1998, Buzbee wrote to Romanick that JHR was not following the terms of the initial loan documents. Later, Buzbee again contacted Romanick and gave him a new Letter of Understanding, which set forth terms similar, but not identical, to those contained in the September 22, 1998 documents. Jaffe did not agree to the Letter of Understanding, except for the provisions that released Buzbee and his wife from personal liability on the loan and that eliminated the pledge of Buzbee's life insurance policy as collateral for the loan. Buzbee testified in his

deposition that JHR tried to obtain Buzbee's personal liability, but he "absolutely refused."

The final loan agreement ("Loan Agreement") was prepared in accordance with the terms set forth in the November 2, 1998 letter. The Loan Agreement was dated November 20, 1998, and was executed by Buzbee, on behalf of Doe Mountain, on December 4, 1998. Critical to this appeal, the Loan Agreement contained the following two paragraphs:

8.18 [Doe Mountain] REPRESENTS AND WAR-RANTS TO LENDER THAT IT (I) HAS READ EACH AND EVERY PROVISION OF THIS LOAN AGREE-MENT, (II) HAS CONSULTED, OR HAS BEEN GIVEN AN OPPORTUNITY TO HAVE THIS INSTRUMENT REVIEWED BY COMPETENT LEGAL COUNSEL OF ITS CHOOSING, AND (III) UNDERSTANDS, AGREES TO AND ACCEPTS THE PROVISIONS HEREOF.

8.19 [Doe Mountain] hereby waives all claims, defenses or setoffs with respect to the negotiations of this instrument or the Loan Documents. [Doe Mountain] represents, warrants and agrees that Lender has made no representations or commitments, oral or written, or undertaken any obligations other than as expressly set forth in this Loan Agreement and the Loan Documents.

Also, one of the documents executed by Doe Mountain, as part of the loan transaction, was a deed conveying the ski resort from Doe Mountain to JHR, which was held by JHR in escrow.

By mid-December 1998, relations between Buzbee and Jaffe had soured. Apparently, Buzbee felt that he had not received the discount he expected when he first approached Jaffe for a loan, and he resented the controls that JHR put on his operation of the ski resort. In a letter dated December 17, 1998, JHR declared Doe Mountain in default of the loan. Between December 1998 and May 1999, JHR sent Doe Mountain a series of letters setting forth the amount of interest due each month and demanding certain information concerning the operation of the ski resort, as required by the loan documents.

Doe Mountain failed to make the May 1, 1999 interest payment.

On June 1, 1999, JHR recorded the deed from Doe Mountain and took possession of the ski resort. It also obtained a confessed judgment against Doe Mountain in Pennsylvania for the unpaid principal balance of the loan, plus accrued interest, late charges, and attorneys' fees. JHR, now Bear Creek, recorded this judgment in the Circuit Court for Montgomery County in March 2001. Bear Creek continues to operate the ski resort.

Meanwhile, Doe Mountain filed for bankruptcy on July 30, 1999, and as part of that action, it filed an adversary proceeding against Bear Creek and Jaffe. We do not need to explore the details of the bankruptcy proceeding for purposes of this appeal. It is sufficient to note only that the U.S. Bankruptcy Court for the Eastern District of Pennsylvania dismissed with prejudice the bankruptcy action and the adversary proceeding on November 8, 2000, for Doe Mountain's failure to prosecute.

On December 8, 2000, Doe Mountain filed the instant action in the Circuit Court for Montgomery County. Its complaint was amended twice, on April 26, 2004 and September 9, 2004. In its brief, Doe Mountain summarizes the substance of the twelve-count, twenty-four page Second Amended Complaint as follows: [7]

The graveman of the Complaint is that the Defendants misled Borrower to believe that the Defendants were interested in providing financing to Borrower so Borrower could enjoy the $2,000,000 savings on its mortgage. That the Defendants had no intention of providing the financing to Borrower, and that the Defendants representations and written Commercial Mortgage Loan Commitments were all done by the Defendants to secure Borrower's trust, while

---

[7]. The complaint specifically pled counts of intentional misrepresentation, constructive fraud, breach of common law obligation of good faith, civil conspiracy, tortious interference with economic relations, breach of fiduciary and/or confidential relationship, aiding and abetting, breach of contract, and fraud in the inducement.

the Defendants secretly purchased the mortgage directly from the then mortgage lender. Borrower alleged that once the Defendants purchased the mortgage for themselves, the Defendants restructured the loan on terms much more favorable to itself. The Borrower alleged that the Defendants forced the Borrower to execute loan documents on less favorable terms than originally represented, and that the Defendants usurped the Borrower's economic opportunity for themselves. The Complaint alleged that the Borrower was damaged as a result of the Defendants' conduct.

Pleadings, discovery, and even an interlocutory appeal to this Court followed. The details of this procedural history are not pertinent to the resolution of this appeal. Instead, we focus on appellees' motions for summary judgment, which were filed on October 7, 2004. The motions lodged a multifaceted attack on Doe Mountain's Second Amended Complaint. In their motions and at a hearing on November 5, 2004, appellees argued that the confessed judgment and the dismissal with prejudice of the bankruptcy case precluded Doe Mountain from prosecuting the instant action under the doctrine of *res judicata*. They also argued that the statute of limitations barred the entire Second Amended Complaint, because Doe Mountain failed to incorporate by reference the original complaint. The circuit court rejected both of these arguments.

A third argument by appellees, however, was successful. Turning to the merits of the case, they argued that summary judgment was in order because there was no dispute as to any material fact and appellees were entitled to judgment as a matter of law. In accepting that argument, the circuit court reviewed each of the relevant documents that the parties signed, including the loan documents dated September 22, 1998, the commitment letter of November 2, 1998, and the Loan Agreement of November 20, 1998. It observed that "all agree that [the September 22, 1998 documents] are no more than letters of intent, not enforceable under Maryland law, with certain limited exceptions not applicable here." The court then quoted, among other things, paragraphs 8.18 and 8.19 of the Loan Agreement. The court concluded:

What this review discloses is that a sophisticated businessman lawyer after receiving outside legal advice at least initially willingly entered into a business relationship, warranted that no prior agreements existed, took advantage of the bargain, received funds as a result of the loan and did not attempt to set it aside or seek alternate financing. In the Court's view this constitutes a ratification and waiver. Now a ratification and waiver, I will read the instruction on this from our pattern of civil instructions.

A party who made a contract because [of] the other party's fraud, duress, or undue influence or because of a mistake cannot cancel the contract after he or she knowing of the fraud, duress or undue influence or mistake sues to enforce the contract or makes a new promise to perform the contract or accepts any benefit under the contract.

Now in this case it is clear that Doe Mountain accepted the benefits of the contract. It clearly received funds that were forthcoming from the loan and utilized those funds. It vitiates any prior causes of action, his actions. To hold otherwise would be to make contracts meaningless. Therefore, this Court finds no material fact to be in dispute and summary judgment will be granted on all counts for all defendants.

In addition, appellees waged two more attacks on Doe Mountain's case. First, on September 24, 2001, they moved to dismiss the complaint because Doe Mountain had not filed the appropriate papers to qualify it to do business in Maryland. Consequently, according to appellees, Doe Mountain lacked capacity to file suit in the circuit court, pursuant to Maryland Rule 2–323(f). The circuit court denied this motion on May 23, 2002, and by September 30, 2004, Doe Mountain had filed the requisite papers with the State of Maryland. Second, on October 7, 2004, appellees moved to dismiss Doe Mountain's demand for a jury trial. The circuit court granted this motion on November 5, 2004.

■ Doe Mountain appealed and presents us with two issues: whether the circuit court erred by (1) granting sum-

mary judgment and (2) dismissing Doe Mountain's demand for a jury trial. Appellees filed a cross-appeal[8] and present us with three more issues: whether the circuit court erred by failing to grant summary judgment based on (3) *res judicata;* (4) statute of limitations; and (5) Doe Mountain's capacity to file suit in Maryland. We uphold the court's grant of summary judgment on the grounds that Doe Mountain waived all of its claims against appellees arising out of the negotiations leading up to the Loan Agreement, as well as arising out of any of the loan documents. Because of our decision upholding the circuit court's grant of summary judgment, we need not address the other grounds offered by appellees, namely, issues 3, 4, and 5.[9] Furthermore, our decision renders issue 2 moot.

## *DISCUSSION*

### I

### *Standard of Review*

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and . . . the party in whose favor judgment is entered is entitled to judgment as a matter of law." Md. Rule 2–501(f). Our review on appeal is *de novo,* as follows:

> When reviewing a grant of summary judgment, we first determine whether a genuine dispute of material fact exists 'and only where such dispute is absent will we proceed to review determinations of law.' 'In so doing, we construe the

---

8.  Appellees Bear Creek, Southern Management, and Hillman filed one brief, and Jaffe, individually, filed another brief.

9.  We also note that appellees' cross-appeal is not proper, because it is from a judgment "wholly in [their] favor." *See Wolfe v. Anne Arundel County,* 374 Md. 20, 26 n. 2, 821 A.2d 52 (2003) (stating " 'that only a party aggrieved by a court's judgment may take an appeal and that one may not appeal or cross-appeal from a judgment wholly in his favor.' ") (citation omitted). We could treat appellees' arguments in their cross-appeal as alternative grounds for affirming the circuit court's decision. However, given our affirmance of the grant of summary judgment on a ground relied on by the circuit court, we need not reach the alternative grounds presented by appellees.

facts properly before the court, and any reasonable inferences that may be drawn from them, in the light most favorable to the non-moving party.' The Court of Appeals has held that general denials and proffered facts, lacking detail and precision, are insufficient to defeat a properly plead motion for summary judgment. Instead, the party opposing a motion for summary judgment must present facts that are detailed and admissible in evidence. '[T]he mere presence of a factual dispute in general will not render summary judgment improper.' As the Court explained in *Lippert v. Jung*, 366 Md. 221, 783 A.2d 206 (2001), 'A dispute as to facts relating to grounds upon which the decision is not rested is not a dispute with respect to a *material* fact and such dispute does not prevent the entry of summary judgment.'

*Mitchell v. Baltimore Sun Co.*, 164 Md.App. 497, 507, 883 A.2d 1008 (2005) (citations omitted). With these principles in mind, we will address Doe Mountain's arguments that the circuit court erred in granting appellees' motions for summary judgment

## II

### *Ratification*

■ Doe Mountain first argues that the circuit court committed reversible error by basing its decision on the doctrine of ratification. Specifically, Doe Mountain claims that the ratification of a contract merely precludes a party from seeking rescission of that contract; ratification "does not deprive the defrauded party of redress for fraud practiced upon him on its inception." In addition, Doe Mountain asserts that the doctrine of ratification actually supports a denial of appellees' motions for summary judgment, because a "party who has knowledge of the fraud prior to performing an executory contract, may, in certain situations, continue to go on with a contract and sue thereafter for damages."

Appellees respond by arguing that the doctrine of ratification does not support Doe Mountain's position, because that

doctrine "contemplates when a party has been induced to enter a contract, subsequently discovers this fraud and then ratifies the contract[,] it may only seek damages for the fraud after completion of the contract." Here, according to appellees, "the alleged fraudulent conduct occurred before the loan contract or loan documents were accepted and executed" and Doe Mountain had full knowledge of the alleged fraudulent conduct prior to the execution of those documents. Consequently, "Doe Mountain was not a person who discovered after entering into a contract that it had been [ ] alleged[ly] induced into that contract by any alleged fraud."

We agree with Doe Mountain that, "when a party to a contract discovers a fraud has been perpetrated upon him [or her], he [or she] is put to a prompt election to rescind the contract or to ratify it and claim damages." *Merritt v. Craig,* 130 Md.App. 350, 358, 746 A.2d 923 (2000). Consequently, ratification of a contract simply precludes a suit for rescission of the contract; it does not forbid claims for damages based on the alleged fraud. *See Sommers v. Dukes,* 208 Md. 386, 393, 118 A.2d 660 (1955); MPJI–Cv 9:29. In the instant case, because Doe Mountain's claims are for damages and not for rescission, the doctrine of ratification does not bar the prosecution of its claims for damages.

Nevertheless, we disagree with Doe Mountain's argument that the doctrine of ratification supports the denial of appellees' motions for summary judgment. Relying on *Sonnenberg v. Security Management Corp.,* 325 Md. 117, 599 A.2d 820 (1992), Doe Mountain contends that it "could sign the loan documents with knowledge of fraud and thereafter sue for damages." Doe Mountain's reliance on *Sonnenberg* is misplaced.

In *Sonnenberg,* the purchasers of townhouses learned, after signing the sales contract but before going to settlement, that there was a pipeline easement on the subject properties. *See* 325 Md. at 120, 599 A.2d 820. The purchasers went to settlement and then sued the seller for fraud. *See id.* at 120–

21, 599 A.2d 820. Upholding the purchasers' fraud claim, the Court of Appeals stated:

'The great majority of the cases support the rule that where the defrauded party has in part, or at least in substantial part, performed the contract at the time of discovering the fraud, he [or she] may go on with performance and also recover or have the appropriate allowance of damages.'

*Id.* at 123–24, 599 A.2d 820 (citation omitted). Likewise, "where the allegedly defrauded party has affirmed the contract by conduct and then sued for damages, our cases have permitted a deceit action even though the fraud was discovered while the contract was executory." *Id.* at 125, 599 A.2d 820. Critical to the court's analysis was that the purchasers learned of the easement *only after signing the sales contracts,* giving down payments, signing loan documents, and selling their previous homes. *See id.* at 130, 599 A.2d 820.

By contrast, in the case *sub judice,* the only contract between Doe Mountain and any of the appellees was the Loan Agreement dated November 20, 1998, and executed by Doe Mountain on December 4, 1998. Doe Mountain does not point to evidence of any fact, much less a disputed fact, material to its claims that was discovered by Doe Mountain *after* it executed the Loan Agreement on December 4, 1998. In other words, there was no discovery of the alleged fraud by Doe Mountain "while the contract was executory." *Sonnenberg,* 325 Md. at 125, 599 A.2d 820. Therefore, the doctrine of ratification, as set forth by the Court of Appeals in *Sonnenberg,* does not support Doe Mountain's claim that it could sign the Loan Agreement with knowledge of the alleged fraud and thereafter sue for damages.

In its reply brief, Doe Mountain seeks to bring its claims back under the umbrella of *Sonnenberg's* teachings by claiming, for the first time, that the loan documents dated September 22, 1998 are contracts. In making this argument, Doe Mountain concedes that these documents do not constitute contracts to provide the financing set forth therein. Rather, according to Doe Mountain, they are contracts that granted to

Jaffe and Southern Management the exclusive right to provide financing to Doe Mountain for a period of sixty days and required Doe Mountain to keep the substance of the documents "confidential."

We agree with the circuit court that the loan documents dated September 22, 1998, are no more than letters of intent and are not enforceable under Maryland law. *See Norkunas v. Cochran*, 168 Md.App. 192, 198, 895 A.2d 1101 (2006), *cert. granted*, 393 Md. 477, 903 A.2d 416 (2006) (stating that the function of a letter of intent "has been to merely provide the initial framework from which the parties might later negotiate a final binding agreement"). More importantly, Doe Mountain actually represented and agreed that the documents dated September 22, 1998 were **not** contracts. In the November 2, 1998 commitment letter, Buzbee, on behalf of Doe Mountain, voluntarily represented that no agreement presently existed "with respect to the modification, compromise or adjustment of the terms of the loan." In paragraph 8.19 of the Loan Agreement, Buzbee, on behalf of Doe Mountain, again represented, warranted, and agreed that there were no commitments or obligations, oral or written, "other than as expressly set forth in this Loan Agreement and the Loan Documents." This Court stated recently that "[t]he principle of freedom of contract dictates that express contract clauses are presumed to be enforceable. Parties are held to the express terms of their contract." *Smelkinson Sysco v. Harrell*, 162 Md.App. 437, 447, 875 A.2d 188 (2005).

## III

### *Waiver*

As an alternative ground for granting summary judgment, the circuit court determined that Doe Mountain waived all of its claims contained in the Second Amended Complaint. The court quoted the following sentence from paragraph 8.19 of the Loan Agreement: "[Doe Mountain] hereby waives all claims, defenses, setoff with respect to the negotiations of this instrument [*i.e.*, the Loan Agreement] or the loan document."

The court also cited the immediately preceding paragraph, paragraph 8.18, which provides, in large type, that Doe Mountain had read each and every provision of the Loan Agreement, had the opportunity to have the Loan Agreement reviewed by an attorney of its choosing, and understood, agreed, and accepted the provisions of the agreement.

Curiously, Doe Mountain does not directly challenge the circuit court's ruling. Instead, Doe Mountain argues that the circuit court erred by relying on "the integration clause (or release provision) contained in the [ ] November 2, 1998 letter agreement." The short answer to this argument is that the November 2 letter does not contain an express waiver of claims. Only the Loan Agreement does. The November 2, 1998 letter sets forth, among other things, Doe Mountain's representations of no defenses or set-offs to the repayment of the CoreStates loan and no existing agreement regarding the modification of that loan. Thus Doe Mountain's claim of error does not dispute the basis of the circuit court's decision.

■ We agree with the circuit court that Doe Mountain waived all of its claims contained in the Second Amended Complaint. Under Maryland law, waiver is defined as the intentional relinquishment of a known right. *See Creveling v. GEICO*, 376 Md. 72, 96, 828 A.2d 229 (2003). The gravamen of the Second Amended Complaint, according to Doe Mountain, was the acts and statements of appellees leading up to the execution of the Loan Agreement. Consequently, all of the claims contained in the Second Amended Complaint constituted "claims ... with respect to the negotiations of [the Loan Agreement] or the Loan Documents," as provided in paragraph 8.19.

■ Doe Mountain contends that there is a question of fact regarding whether Doe Mountain had knowledge of the alleged fraud perpetrated by appellees. The record belies this contention. Viewing, as we must, the facts in a light most favorable to Doe Mountain, the following facts are undisputed.

Buzbee was led to believe that Jaffe and Southern Management were interested in providing financing to Doe Mountain

so that Doe Mountain could take advantage of the approximately $2,000,000.00 discount on its mortgage loan with CoreStates. Buzbee, Jaffe, and Hillman signed loan documents on September 22, 1998, setting forth the basic terms of such financing. Buzbee later learned that Jaffe had made an offer to purchase the Doe Mountain mortgage loan directly from the bank. Although this arrangement differed from the original plan of providing financing directly to Doe Mountain to pay off its loan, Buzbee encouraged the bank to accept Jaffe's offer. Buzbee supported Jaffe's efforts to buy the loan, because it was his understanding that "they would purchase the loan and pass on to me whatever they agreed to purchase it for." Thereafter, Buzbee knew that Jaffe was successful and that JHR purchased the Doe Mountain mortgage loan from the bank.

On November 2, 1998, however, Buzbee was presented with a commitment letter from JHR that set forth a restructured loan agreement significantly different from the terms set forth in the September 22, 1998 documents and much more favorable to JHR. Buzbee, on behalf of Doe Mountain, signed the letter, but immediately attempted to renegotiate the loan because JHR was not following the initial loan terms. Buzbee's efforts to renegotiate the loan proved unsuccessful, and the Loan Agreement was prepared in accordance with the terms set forth in the November 2, 1998 commitment letter. Buzbee, on behalf of Doe Mountain, executed the Loan Agreement on December 4, 1998.

It is clear, therefore, that at the time of executing the Loan Agreement on December 4, 1998, Doe Mountain knew all of the facts underlying its claims in the Second Amended Complaint. It knew that JHR had purchased the Doe Mountain mortgage loan from the bank and had not "passed on" the full discount originally contemplated. It was aware of all of the changes or modifications to the initial terms set forth in the September 22, 1998 documents. It also knew all of the other, less favorable terms of the Loan Agreement. Doe Mountain does not identify any material fact that was not known by Buzbee at the time that he signed the Loan Agreement and

loan documents on December 4, 1998. Accordingly, there is no genuine dispute as to any material fact regarding Doe Mountain's knowledge of the claims that it was waiving when the Loan Agreement was executed.

██ Finally, Doe Mountain argues that appellees' conduct "forced [Doe Mountain] to execute loan documents on less favorable terms than originally represented." Specifically, Doe Mountain claims that appellees' threats of immediate foreclosure "coerced" Doe Mountain into signing the November 2, 1998 commitment letter, the Loan Agreement, and the loan documents. Doe Mountain, however, does not contend that the threats of immediate foreclosure "coerced" Doe Mountain into waiving all of its claims related to the negotiations leading up to the Loan Agreement. Moreover, Doe Mountain does not point to any material fact supporting the conclusion that appellees coerced a waiver of Doe Mountain's claims. Indeed, Buzbee testified that appellees tried to retain in the Loan Agreement his and his wife's personal liability for the loan; but when Buzbee "absolutely refused," the provision for personal liability was removed from the Loan Agreement. Additionally, the Loan Agreement clearly states that after having had the opportunity to consult with an attorney, Doe Mountain understood, agreed, and accepted all of the provisions of the Loan Agreement, which included the waiver of all claims related to the events leading up to the execution of said agreement and to any of the loan documents. Therefore, there are no material facts, much less a genuine dispute as to a material fact, supporting the conclusion that Doe Mountain was in any way forced to waive the claims set forth in the Second Amended Complaint.

For the foregoing reasons, we conclude that the circuit court did not err in granting appellees' motions for summary judgment on the grounds of waiver. Maryland law and the record before us support the conclusion that when Doe Mountain executed the Loan Agreement, it voluntarily and knowingly relinquished all of its claims relating to the negotiations leading up to the execution of the Loan Agreement, which

claims are embodied in the Second Amended Complaint. As the circuit court aptly stated: "[T]o hold otherwise would be to make contracts meaningless."

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED; APPELLANT TO PAY COSTS.**